(69 South. 23)

No. 21070.

BOARD OF CONTROL FOR LEPERS' HOME OF LOUISIANA v. BENEDICTINE FATHERS OF COVINGTON et al.

(June 7, 1915.)

*(Syllabus by Editorial Staff.)*

1. WILLS &302—EVIDENCE—DICTATION.

In a suit to set aside a codicil in nuncupative by public act form, evidence *held* to show that the codicil was dictated by the testatrix.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 575, 581, 700–710; Dec. Dig. &302.]

2. WILLS &148—EXECUTION—DICTATION—QUESTIONS.

A codicil in nuncupative by public act form is valid if the testatrix of her own mind wished to make bequests contained therein and expressed that wish to the notary, though questions were put to her regarding it.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 358–366; Dec. Dig. &148.]

Appeal from Twenty-Second Judicial District Court, Parish of East Baton Rouge; H. F. Brunot, Judge.

Suit by the Board of Control for the Lepers' Home of Louisiana against the Benedictine Fathers of Covington and others, to set aside a codicil of the will of Mrs. J. M. Parker, deceased. Judgment for the defendants, and plaintiff appeals. Affirmed.

R. G. Pleasant, Atty. Gen., and Harry Gamble, of New Orleans, for appellant. L. D. Beale, of Baton Rouge, and James J. McLoughlin and Frank McGloin, both of New Orleans, for appellees.

PROVOSTY, J. The board of control of the Lepers' Home brings this suit, through the Attorney General, to set aside a codicil to the will of Mrs. J. M. Parker, deceased. In her will, Mrs. Parker made certain special legacies, and named five residuary or universal legatees, among them the plaintiff in this case. By a codicil, executed some two years later, she gave $25,000 to the Benedictine Fathers of Covington, La., $10,000 to Judge Frank McGloin, $2,000 to the Sisters of St. Joseph of Baton Rouge, and appointed two testamentary executors. The present suit is against these legatees and the testamentary executors.

The grounds of action are that the testatrix at the time of making this codicil was incapable of making a will, by reason of both mental and physical malady, and that she did not in fact dictate the said codicil. The said codicil is in nuncupative by public act form, and therefore had to be dictated by the testatrix in order to be valid.

The mental capacity of Mrs. Parker may be at once put out of question, as the evidence in that regard is so one-sided that the discussion of it would be simply waste of time. No act or word indicative of mental unsoundness is adduced, and the testimony of the attending physician and of the trained nurse, to the effect that in their opinion she was insane, is based, even accepting their testimony as true, upon absolutely nothing except the heaviness of her tongue in speech, her slight lapses of memory, and inclination to drowsiness or stupor.

[1] She was a widow, and had accumulated a fortune, which we understand was large, by conducting a mercantile business in the city of Baton Rouge, and had retired from business some years previous to her death. Her age is not mentioned in the briefs, nor in any of the documents, and if in the 346 pages of the testimony, we do not remember it. We gather, however, that she was well advanced in years, probably 60 or thereabouts. She was corpulent, and at the time of her death, had been suffering for several years from rheumatism and chronic Bright's disease. She lived in her own house, in the city of Baton Rouge, with a young lady companion, and two of the university students boarded at her house.

The codicil was made on June 3, 1913. It is contended by plaintiff that a few days previously, on May 28th, she had had an

apoplectic stroke. Some days before this, on May 7th, 8th, and 9th, she had consulted Dr. Hummel in New Orleans, having gone there for that purpose. In the preceding month, she had done the same thing. On these occasions Dr. Hummel had found that for a person of her age her blood pressure was not abnormal, being 140; that her urine showed a Hyland cast, which we understand to be an indication of Bright's disease; that she was—

"what one might call slightly senile in mentality, by this I mean that it was to be noticed that this lady's mind lacked flexibility; that she was not as impressionable to stimuli from her surroundings as a much younger person would be; that she was perhaps slightly forgetful. * * * She suffered from a slight difficulty in hearing; one had to speak rather loud to her, or rather pointedly, with a slightly raised voice. I noticed, also, that her eyesight was slightly impaired, to such an extent that her ability to get around seemed to be somewhat limited. * * * There was present incipient cataract in both eyes."

The attending local physician, Dr. Fridge, testified that from the date of the death of her brother, which occurred on the 3d day of May, 1913, she "went to bed and practically never got up again * * * continuously got worse and worse all the time," and the trained nurse testified that from and after the 21st of May Mrs. Parker—

"did not go out of her room at all, that I know of, and I certainly would have known of it if she had done so."

But the two students who boarded at the house conversed with her as she was seated on her gallery on the 31st of May, and Judge Laycock, her legal adviser and friend, went to her house on the 26th of May to get her proxy for voting at a tax election which was to take place on the next day, the 27th, and—

"found her seated on her front gallery talking to two Brothers from the St. Vincent Academy —one of them was Brother Charles, but I don't know the name of the other fellow."

And, as already stated, she was in New Orleans on the 7th, 8th, and 9th of May consulting Dr. Hummel.

The codicil was made at night, as she lay in her bed. There were present in the room, the notary, three witnesses, one of whom was the trained nurse, Judge McGloin, and a Mr. Hines. The lady companion of Mrs. Parker, Miss Comford, was on the gallery, and could see and hear what was going on. Dr. Fridge was in the hall, near the room door, and could hear.

Mr. Hines had been in the employ of Mrs. Parker while she was in business, and had afterwards attended to collections for her, and also advised her in her business, and she held him in much esteem and affection; and he visited her house very frequently. He expected to be remembered in her will, and hence was advised by Judge McGloin that he could not serve as one of the witnesses; it was on this account that the trained nurse, Miss Le Blanc, was called to serve as a witness in his place. It was he who had procured the notary and the witnesses. In the morning of that day, very early, Mrs. Parker had sent for him; but, he says, when he reached her house—

"she did not recognize me at all, didn't seem to be able to talk to me, and I didn't see any use in my staying there, and I left instructions that if she wanted me later on to call me at the store, and they did so."

She then told him that she wanted Judge McGloin to be called, that "she wanted to fix up her business." The witness telephoned Judge McGloin in New Orleans, and Judge McGloin came to Baton Rouge in the afternoon, and that evening the codicil was made. A neighbor and friend of Mrs. Parker, a legatee for $2,000 under the uncontested will, Mrs. McCormick, a constant visitor at her house, saw her that same day, and describes her interview, as follows:

"This was in the afternoon of June 3d, 1 went into her room, and she was alone. I stood by her bed and said, 'How do you do,' and asked her how she felt, and she said she didn't feel so well. Then she said, 'Bridget, I have sent for Judge McGloin to fix up my business,' and just then Judge McGloin came up the steps,

and I said, 'Here is Judge McGloin now,' and she said, 'Let him in and go out and shut the ·door.' "

The codicil was begun to be made at 8 o'clock in the evening of that same day, and the making of it occupied some two hours. The mental operations of the testatrix were slow, owing to her great weakness and low condition, and her utterance was difficult and indistinct as the result possibly of partial paralysis following apoplexy, or perhaps simply of great weakness.

The same Mr. Hines who had summoned Judge McGloin and chosen the notary and witnesses to make the will, appeared as a witness for plaintiff. He testified that the old lady—

"seemed to be in a sort of stupor and had to be ·continuously aroused. The nurse 'would tell her, 'Mrs. Parker, they are speaking to you,' .and then she would partly arouse her; and then the question would have to be repeated to her. Q. Will you undertake to describe how the notary ascertained to—discovered what the will of Mrs. Parker—what the will or mind of Mrs. Parker was in respect to, say, the first bequest of $25,000 to the Benedictine Fathers, especially in regard to the mode of ascertaining what Mrs. Parker desired, and how she expressed her desires, if any she expressed? A. Well, she named the amount, but she did not name the party to whom she wanted to leave it. Q. How was the fact ascertained· as to who ·she desired to bequeath that $25,000 to? A. Well, they told her that she would have to tell them who this $25,000 was to go to, and, as well as my memory serves me, she said, 'The priests at Covington.' Q. Did she name what Fathers at Covington—did she give the name of .the order of priests at Covington that was to receive this $25,000? A. I don't remember her naming them. It was suggested that she meant the Benedictine Fathers, and to that she assented."

Miss Le Blanc, the trained nurse, called as .a witness for plaintiff, on being asked to testify how this same bequest was dictated said:

"Well, when Judge McGloin was sitting on the bed, Mrs. Parker was in this stupor, and Judge McGloin spoke to her several times. He says: 'Mrs. Parker, this is Judge McGloin—you have sent for Judge McGloin, have you not?'—but she didn't respond to him at all. He repeated it, and finally she said, 'Yes.' He said: 'You sent for me to fix up your business for you; didn't .you, Mrs. Parker?'—and he repeated that a

couple of times before he could get her to respond, and then she said, 'Yes,' and finally, when she was roused up, she mentioned, very low, $25,000, and Mr. Cline turned and asked her what did she mean that $25,000 for. Q. Who did he turn to? A. To Judge McGloin. He turned and faced Judge McGloin. Q. He asked Judge McGloin who? A. Yes, sir; asked her who did she mean the $25,000 for. Q. Then what transpired? A. Then Judge McGloin turned to Mrs. Parker there and says, 'Who do you mean the $25,000 for?' and repeated that a couple of times, and Mrs. Parker says, 'The priests.' Judge McGloin says, 'What priests?' and at first she didn't answer him, and then he repeated, 'What priests do you mean?' and she says, 'Of Covington,' and then I remember Judge McGloin turned and said that she meant the Benedictine Fathers."

Dr. Fridge, as a witness for plaintiff, testified on the same subject, as follows:

"When I first came in the room, the first thing I heard—they were arguing about who she was going to give a certain $25,000 to—I did hear her say $25,000. Q. Who was doing the arguing? A. I think pretty nearly everybody in there was talking and taking part in the discussion. Q. Do you recall just what was said about it? A. Well, I heard Mrs. Parker say $25,000, and then she stopped, and they wanted to know who it was for, and she didn't make any answer, and they kept asking who she meant and what she meant, and, finally, she said, 'For the Fathers.' And then there was some discussion as to what Fathers she meant. She said again, after some discussion, that the $25,000 was for the Fathers. She then stopped again, and finally said, 'The Fathers at Covington.' And then some discussion took place as to where it was going to. They didn't seem to understand her clearly, and then Judge Cline asked her some questions, and possibly Judge McGloin did, but as to that I do not just remember, or just what the questions were. She did not seem to be able to tell them what she wanted to do, really. They were all trying to help her out, asking if it was for this, or for that, and so on. Q. I hand you the codicil, and ask you to read item 1, and then I ask you, Doctor, to repeat as nearly as you can—giving us a picture, as far as you can do so by words— of how that item of bequest was made there that evening, referring to the bequest of $25,000 to the Benedictine Fathers. I mean to ask you to give the court, as nearly as you can, a thorough comprehension of just how the bequest of $25,000 to the Benedictine Fathers was given by Mrs. Parker—in what manner she gave it, how she spoke it, what efforts were made, if any, to interpret or clarify her remarks, and, in fact, Doctor, all of the transaction as it took place, as nearly as you can remember it. A. Well, I recall that I heard her tell Judge Cline—that Judge Cline told her that they were ready. She made no reply. Finally he asked her what she

wanted to do, and that was in the first instance, when the $25,000 matter was up. She said the words as I have given them to you, and then she stopped. She didn't say any more. They told her that she would have to tell them a little more. Judge Cline told her that she would have to say it in a certain way, or something like that, but she didn't make any reply. She remained there perfectly quiet. The question was repeated to her several times, and she finally said this, 'Twenty-five thousand dollars.' She named the amount, but she didn't name who it was to go to, and several questions were put to her asking her who she wanted it to go to, or who she wanted to give it to, and she answered, after a while, 'The Fathers at Covington.' Then as I said a while ago, some discussion took place between several people, I don't know just who, as to getting it down in a little more concentrated form, trying to get her to express herself a little more definitely on the point, though she seemed to be unable to do it, and finally somebody mentioned the name—she called the name—the Benedictine Fathers, or some such name. Somebody named the Fathers, and then I think her actual response was, 'Yes, sir.' She spoke very indistinctly. She did not speak clearly at all. Her tongue was thick. That was my understanding of it. Q. If I understand you, everybody was mutually helpful there? A. They seemed to be; I suppose everybody would be, under conditions like that. They were trying to render her what service they could, and willing to help her answer her questions, because she was really not in condition to do it by herself."

On the same subject the notary, as a witness for defendants, testified, as follows:

"Q. Do you remember the legacy to the Benedictine Fathers? A. Yes, sir. Q. Do you remember how that was suggested—how that came about? A. Well, it was not suggested. As soon as I told her I was ready, after writing the preliminary paragraphs, to take her dictation, she says: 'Want you to give $25,000 to the school at Covington, for the priests. You all know what school I mean, I want to give it to the fathers over there.' I then said to her: 'Well, Mrs. Parker, you will have to state it like you want it, you have to use'—well I don't remember whether I told her just that way, or whether I told her—I think I told her this way: 'Mrs. Parker, I have to write this down just as you speak it. You mean to say: "I give and bequeath so and so?"' She says, 'Yes, sir; I give and bequeath $25,000 to this school. You all know who I mean.' And some one then said to her, 'Do you mean the Benedictine Fathers?' and she replied, 'Yes; that is the school I mean.' She had named the place where the school was located all right, but she could not think of the name of the school itself. Q. That is the Fathers? A. Well, I remember her stating that she wanted the money to go for the education of priests."

137 LA.—20

One of the witnesses to the codicil, Mr. Monget, called by defendants, testified on the same point, as follows:

"Q. Did she express herself so that you understood everything that were her wishes, as she stated them? A. Yes, sir. Q. Now, just what do you recall about the bequest of $25,000 to the Benedictine Fathers? A. Well, she mentioned $25,000. I don't know just what her preliminary words were, but I know she said $25,000, and then some one there, either Judge McGloin or Judge Cline, asked her what she wanted to do with it, and I think she said that she wanted to give it to the Benedictine Fathers. Then she was asked whether it was the Benedictine Fathers at Covington or some other place, and she said at Covington. Q. It has been stated by some of the witnesses during this examination that during the execution of this will Mrs. Parker would go off into stupors, and that she had to be shaken and roused up. Did you see anything of that kind? A. No, sir; I did not see her shaken at all. As I said she would stop and seem to be exhausted, and we would have to wait for a little while before she could go ahead, but I did not see anybody shake her or rouse her. * * * Q. Were there any suggestions made as to these money legacies? A. No, sir; I did not hear any suggestions made."

Mr. Lambert, the other witness to the will, called in behalf of defendants, testified, on the same subject, as follows:

"Well, as I stated, physically, I think that Mrs. Parker was right sick, but there was nothing went on there to show me that there was anything wrong with her will for me to raise any objection to the will being continued with. Q. Now, when the bequest to the Benedictine Fathers was made, how did that come about, as your recollection of it is? A. Well, she said that she wanted to leave $25,000 to the Benedictine Fathers, but she did not specify Covington, or this other place, whatever the name of it is, and then the question was asked, I think by Judge McGloin, 'Mrs. Parker, do you mean the Covington priests or the others?' and then she said, 'The priests at Covington.'"

Judge McGloin testifies that Mrs. Parker spoke so as to be understood, that she expressed her wishes, and that the notary took them down as she dictated them; that he, Judge McGloin, insisted upon having in every instance a clear expression of her wishes; that if he had noticed anything indicating either mental or physical incapacity on the part of Mrs. Parker to make a will, he cer-

tainly would not have allowed the proceedings to go on.

Rev. Fr. Vincent Cirlino, a local secular priest, in no way interested pecuniarily in the controversy, testified that Mrs. Parker, having told him that she intended to dispose of her property for religious purposes, he said to her:

"I am glad to hear that, and I wish that you would consider two very good institutions which you might help; one is the free Catholic school in Baton Rouge; and some legacy for the education of priests here in the diocese in the Seminary of the Benedictine Fathers. Then she wanted an explanation of both of these two subjects. First, I explained to her about the good that it would do to get the good priests here from Louisiana for Louisiana rather than from France and Italy, etc., and after explaining that to her, she was enthusiastic about the education of the priests, but for the school purposes she says: 'No, I don't believe in that. If the parents want to have their children educated they should pay for the children.' Now, that was the first conversation about that subject. After maybe one or two weeks I went there, and she moved the question herself. She said: 'I have thought about the institution of a legacy for the education of the priests, and I like that idea very much. How much can I leave for that purpose?' And I says, 'As much as you like to leave for it. I know that in Boston some man left some $80,000 or $100,000 legacy, enough to educate 80 or 100 young men.'"

This same priest saw and conversed with Mrs. Parker on the 28th or 29th of May, 1913, a date which he remembers from the fact that he left for Italy on the last day of that month, and he says that he saw nothing to indicate that she was then incapable of attending to her affairs.

Miss Comford testified, as follows:

"Q. State your best recollection of what you saw and heard in relation to the legacy to the Benedictine Fathers. A. She said: 'Twenty-five thousand dollars;' first, and then she said: 'To the Benedictine Fathers at Covington.' Q. Did anybody suggest that to her? A. Well, I didn't hear it. Q. Would you have heard the suggestion if anybody had made it? A. Yes, sir; I think so. I heard everything else, I think. Q. Were you watching her? A. Yes, sir; I was watching her. Q. Did she ever have to be shaken or roused at all? A. No, sir; I didn't see any of that."

[2] It is perfectly evident from all this testimony that Mrs. Parker wanted to bequeath this sum of money to the legatee named in the codicil, and that she expressed that wish to the notary; that it was the result of the operation of her own mind. Nothing more than this is required for the validity of the dictation of the will. The fact that questions were put to or by her does not invalidate. Succ. of Saux, 46 La. Ann. 1423, 15 South. 421; Landry v. Tomatis, 32 La. Ann. 118; Hennessey v. Woulfe, 49 La. Ann. 1380, 22 South. 394; Succ. of Crouzeilles, 106 La. 442, 31 South. 64.

The testimony which we have quoted here touching the first legacy illustrates the testimony bearing upon the other legacies. To reproduce the latter here would be pure waste of time.

The three witnesses of plaintiff have impressed us as showing a disposition to exaggerate the drowsy condition of Mrs. Parker. And the same as to her mental condition. For instance, Miss Le Blanc, the trained nurse, after she had repeatedly testified to the inability of Mrs. Parker to complete her sentences, was pressed by plaintiff's counsel for an instance, or illustration, of this aphasia, and here is the illustration she gave:

"Well, one day we were talking—she had a very bad cold, and she said to me, 'I am going to die,' and I said to her, 'Oh, no, Mrs. Parker, you are not going to die,' and she said, 'Yes, I am,' and I said, 'Why?' and she says, 'I caught cold in New Orleans,' and I said to her: 'Mrs. Parker, I wouldn't talk like that. Anybody can have a cold.' And she says, 'No, I sat under a damned old electric fan for three hours in the doctor's office.' And I said, 'Mrs. Parker, who did you sit there with?' and she says, 'With Ellen Mulvahill.'"

Even on the testimony of Mr. Hines the will would be valid.

Judgment affirmed.