BREAUX, O. J.
The last will and testament of the late Mrs. H. R. Jones, dated August 11, 1904, was presented for probate on the 22d day of May, 1906, by James Reed, executor. It is olographic in form. He also presented a codicil to the will in nuncupative form, dated August 18, 1905.
This application to probate the will and codicil met with the opposition of James R. Mitchel, the only heir of the testatrix, her son and sole offspring.
The grounds of the opposition are that Mrs. Jones was, and had been for some years prior to the date of the will, a sufferer from senile dementia; that she was an interdict, without capacity to make a will; that it was not her will, and for that reason the court is asked to declare it null and decree that it can have no effect.
Another instrument, written in pencil, dated October 20, 1904, was presented for probate some time after the will above mentioned had been presented and filed; and still another paper, written in ink, was found, dated October 20, 1904, and presented to the court.
All of these wills were opposed on the grounds before mentioned.
The proponent sought to have probated the will dated October 20, 1904, filed June 11, 1906, and the codicil filed May 25, 1906.
There are two questions presenting themselves which we will dispose of at this time, as they are in their nature preliminary.
The first question is whether the deceased was the author of the will.
The opponent conceded that proponent had the affirmative, and it follows therefrom that he had the right to offer his evidence first, then the opponent to reply, and the proponent to rebut.
To this point the opposition urged no objection. From this point the contention is that, inasmuch as the opponent has the burden of proof as relates to the issue of insanity, he claimed the right to offer his evidence, the proponent to follow with his, and for him the right to offer his evidence in rebuttal.
The judge of the district court refused to permit the proponent to close.
We do not find that an error was committed.
The following is an excerpt from the brief of opponent’s counsel:
“The opposition of James R. Mitchel was like that of plaintiff in reconvention.”
It remains that proponent was plaintiff and opponent defendant. After the former had closed his evidence, the defendant produced his proof in support of his opposition. The plaintiff then brought additional evidence.
It does not occur to us that in this any- rule of practice was disregarded; for, although defendant raises a distinct issue, requiring affirmative evidence, it does not give him the right to open and close. He was not a plaintiff in reconvention, and did not have the right to open and close in the trial. Moreover, no objection was timely urged. Parties must be held to have acquiesced.
Effect of the Judgment of Interdiction.
The testatrix was interdicted by a judgment of the civil district court in February, 1906. An appeal was taken by defendant from the judgment of interdiction. She died while the appeal was pending, after argument, before the Supreme Court could decide the case. The appeal was dismissed. Further upon the subject later.
The contention of opponent, as stated in the brief of his counsel, is that the judgment of the lower court none the less became final *991 and absolute and bad tbe force of a thing adjudged.
We cannot agree with that view. The proceedings were annulled, the suit abated by the death of Mrs. Jones,-and the judgment had no effect as res judicata. It and the evidence taken on the trial for interdiction must be to some extent persuasive; but they are not authoritative, and the judgment has none of the effects of a final judgment. There was no right acquired under the judgment.
The maxim is in point, to wit, “Actio per-sonalis moritur cum persona;” that is, the action died with the person.
In May, 1907, the district court, in the case pending before us for decision, ordered that the will and the codicil before mentioned be probated and executed, and dismissed the opposition.
The opponent prosecutes this appeal.
Mrs. H. R. Jones was an old lady, about 75 years of age. She was first married to Mitchel, and some time after his (Mitehel’s) death she married H. R. Jones, who died a few weeks after the date of his marriage. She, as before stated, had only one heir (the opponent), James R. Mitchel, who is the offspring of the first marriage. She had been fairly well educated, had been taught music, and it appears played fairly well on the piano. She spoke two languages and wrote with facility — was fond of writing. Tears ago she came to New Orleans with her first husband. Here she resided up to the date of her death.
After the death of her second husband she left the management of her affairs in the hands of her son, who continued without interruption to manage her interests for her until he removed to New York, years ago, to reside permanently.
After her son had left she intrusted her affairs to another person. They were properly taken care of for a number of years. Finally the management fell into the hands of James Reed, the proponent. The management by him proved quite satisfactory to her.
Reed was her youngest brother, to whom she was quite partial. He was many years her junior. He had great influence over her.
It is charged by opponent that he (Reed) dominated her mind to such an extent that, although she had been a very intelligent woman, self-willed and competent to manage her business, she fell completely under his influence and domination. As time passed it increased; but he does not seem to- have retained, if he ever had it, the good will and sympathy of the other members of the family. They evidently looked upon him and his management, together with the influence he exerted, as those which are usually exercised by the legacy hunter.
The relations among the members of the family with Mrs. Jones and the brother, the l)roponent, we take it from the evidence, were not always harmonious.
Testimony of Members of the Family.
The daughter of opponent, Misa Ida Mitchel, wrote to her grandmother and called upon her. Her letters in answer are in evidence.
If the evidence of members of the family is to control, her case is doubtless one of profound dementia. They detailed her eccentricities and oddities — her illusions, delusions, and hallucinations. .
Testimony of Servants.
Four servants of Mrs. Jones have testified regarding her eccentric manner and her strange utterances at times. They had worked for her and waited on her at different times. Their testimony also went to prove that Mrs. Jones was not sane. One of these servants, the most intelligent of the number, it is said, testified that she never saw Mrs Jones add, or examine checks, or sign them, *993 without being told; that she did not sign receipts for articles when brought to the house, except when told by the witness; she would never examine or rectify checks and receipts; she never saw her write letters, or copy anything, but did see her write checks when James Reed, the proponent, was near; sometimes heard him say something, but paid no attention; she never gave her any letter to mail; she had no writing desk; she often repeated that she had been sick; she never started a conversation; she was sometimes locked in her room by her brother; she always spoke pleasantly of her son, and sometimes imagined that he had been to see her; she (witness) would see Mrs. Jones in her room reading her Bible; there were certain chapters in the Bible that were her favorites. The witness would sometimes read something to her. Sometimes she (Mrs. Jones) read from the Bible to her. Mrs. Jones spoke of birds, how light they flew in the air, and spoke to domestic animals in and about the house, she said.
There are pages of testimony of these servants. The other servants who testified were even more positive in regard to the mental condition of Mrs. Jones.
It is generally known that servants do not always sympathize with those by whom they are employed. Sometimes, instead of sympathy, it is entirely the other way.
Testimony of Acquaintances.
This brings us to a consideration of acquaintances. A number of them are members of the Carrollton Avenue Methodist Church, of which Mrs. Jones was a member. She was a devoted member of the church and engaged in devotional exercises.
The contention is, in regard to these exercises, that they do not signify much as relates to sanity, because they may be engaged in without much mental effort. Be that as it may, the testimony of the other members of the church is favorable to her sanity. The pastor of the church, Rev. Mr. Ray, frequently visited her as her pastor. His first pastoral visit to her was in April, 1905, in regard to which the minister states:
“I never made a more delightful visit since I have been in New Orleans. She did most of the talking — talked of her home, her early life, her church associations.”
Often thereafter he called on her, and she always received him pleasantly, and nothing in her manner or talk excited the least suspicion of her unsoundness of mind.
Mrs. Jones met with a severe accident, in which her collar bone was broken. That was early in 1905. A day or two afterward the pastor called upon her and found nothing remarkable; says that she was suffering from pain. With reference to her dress she was always neat.
Regarding the suit for her interdiction, the statement is that she appeared very melancholy, and he adds:
“I might say that it hastened her death. I talked with her very little after the interdiction suit. Her conversation was that of an elderly, feeble, but devoted Christian lady in every word that I ever heard Mrs. Jones utter.”
The other members of the church who were heard as witnesses testified that they never discovered indications of insanity on the part of Mrs. Jones. On the contrary, they spoke of her in kind and affectionate terms. She undoubtedly had the sympathy of the entire congregation, basing the conclusion upon the testimony of those who testified.
It appears that Mrs, Jones numbered Mrs. W. W. Carre among her friends. The latter remembered her friend, and sent her a Christmas remembrance, which Mrs. Jones received and acknowledged as follows:
“Mon., Jan. 1, 1906.
“Dear Mrs. Carre:
“The basket of fruit sent me on Christmas day was beautiful, and I thank you for it. I have eaten of the oranges, grapes, raisins, pecans, and almonds, and I will have one of the apples baked for my lunch to-day.
“My Christmas was calm and hopeful.
*995 “I have trusted in the Lord for so many years, and I will trust him still. He has promised never to leave or forsake me.
“I wish you a happy New Year.
“Yours truly, H. R. Jones.”
This letter, Mrs. Carre testifies, was in the handwriting of Mrs. Jones, whose handwriting, from a correspondence of many years, she recognized.
Later, when Mrs. Carre called upon Mrs. Jones, the following occurred, as testified to by Mrs. Carre:
“Q. Will you repeat to this court just as accurately as you possibly can any conversation that you at any time had with Mrs. Jones after the suit for interdiction was brought, giving it as accurately as you can recollect it — what you said to her and what she said to you in reply?
“A. Well, I called upon Mrs. Jones shortly after I received this letter thanking me for the fruit, which you showed me a moment ago. When I went in Mrs. Valentine said: ‘Mrs. Jones, here is some one to see you. Do you know her?’ She looked up at me and said: ‘Yes; that is Mrs. Carre. If I don’t know Mrs. Carre, then I don’t know anybody.’ So I sat down, and Mrs. Jones said to me: ‘Mrs. Carre, you don’t know how much I enjoyed that fruit you sent me. If you will look up on the mantelpiece, you will see that I have a little of it left. There is the basket on the mantelpiece, and I have a little of it left. Not only have I enjoyed it very much, but my brother has enjoyed it, too.’
“Q. Who was present at that interview between you and Mrs. Jones?
“A. There was nobody present at the time, except Mrs. Valentine.”
This appears all very natural, if it be true.
We have no reason to pronounce it untrue. Nothing in the evidence would justify the pronouncement. She may have been weak mentally. Indeed, we think she was. But having been fairly well educated, moved in good society, accustomed to the little amenities which lend so much charm to life, she, on receipt of the fruits, could not better express her appreciation of the attention shown..
Mrs. Jones wrote another letter to Mrs. Carre, which reads:
“Jan. 11, 1906.
“My Dear Mrs. Carre:
“I have read with deep interest your note of tó-day, and will be pleased to have Bishop Morrison call to see me to-morrow afternoon.
“I will be ready when Mrs. Halbert, Mrs. Bar-tels, Mrs. Smith, and Mrs. Bothic will call.
“I am glad you have asked them to be witnesses for me.
“Of course, I will be well enough to meet you when you call. I hope, for his own welfare, that my son will be defeated. My brother, James, and I are praying for this every day. With much love in return, I am,
“Yours truly, Henrietta R. Jones.”
The “defeat” related to the suit brought by her son for her interdiction.
Mrs. Carre swears that this letter also was in the handwriting of Mrs. Jones. There is no testimony which disproves this sworn statement.
The following is a copy of the letter from the granddaughter to her grandmother, written from New York on August 6, 1904:
“Dear Grandma:
“Your postal received by me a few days ago, and I thank you very much for it.
“I .had a most delightful trip, and certainly prefer traveling by sea to the train with its smoke and noise and dust and crowded quarters.
“The weather was pleasant, excepting the day we spent in Gulf Stream, and the sea was calm, so there was very little seasickness on board. I spent most of my time on deck, and escaped an attack of mal de mer, proving a much better sailor than I had expected.
“All the passengers ate so heartily that the captain said the company was losing money on us.
“Papa met me at the pier when the boat— I found him looking very well.
“Prank is in the city with us to spend his vacation.
“Jimmie is at the summer school connected with Cornell University, pursuing studies which will shorten his time at college. In a rash moment he undertook Drench, and he finds the accent a little too much for liis ability.
“Have been having my throat treated since I have been here, and already there is considerable improvement.
“I hope your foot is better. If you were here you would certainly find people who could doctor it for you.
“Have you made up your mind about the St. Louis Pair yet?
“The weather here has been quite cool. I wear my jacket quite often.
“Remember me to Uncle James.
“Hoping to hear from you soon, I am
“Your affectionate granddaughter,
“[Signed] Ida.”
The following is a copy of a letter written by Mrs. Jones in reply to the above-copied letter:
*997 “New Orleans, Sept. 8, 1904.
“Dear Ida:
“I have promised myself the pleasure of answering your letter for some time, but I have so lame that I could not do it. I am glad to learn that you kept well and enjoy your trip to the ocean. I have taken one or two trips by water, and must say that I have traveling that way very pleasant. I recall a trip I once made from Pernandina to Savannah, by one of the coast steamers, which was fine, the weather was good, the fare was excellent, and I enjoyed myself altogether very much. On that occasion I believe there was one on board that was seasick.
“It must have been reassuring to you to find your father waiting for you at the pier. So your brother Prank is with you, and Jimmie is still at school, I should not think that he would have trouble with the French accent it seems to me is pretty good. I hope your throat continues to improve. I have not seen Mrs. Oreen, as I have not been out at all. Thomas was here once and is looking ver well.
“I did think at one time of going to the Pair, but as my foot is still so lame I expect that I have pretty well given it up. We have been having a great deal of rain — almost every day it rains, and the weather has been much cooler, and I find my coat often none too heavy for me.
“Uncle James wishes to be remembered to you.
“With love I am affectionately'
“Your grandmother,
“[Signed] H. R. Jones.”
(The letter is copied just as written.)
Although anticipating a little, as we intend to discuss the testimony of the experts altogether hereafter, we none the less deem it best to reproduce these letters here and the testimony of one of the experts, Dr. S. P. Mioton, regarding these letters, because his answer is quite pertinent to the issue.
In reply to question of counsel, Dr, Mioton said:
“The mental condition of Mrs. Jones was certainly good, if one is to judge by this correspondence. Every thing that is contained or touched upon in the letter signed ‘Ida,’ written to her ‘Dear Grandma,’ is answered in detail in the other letter. Even the person that Ida asked to be remembered to — ‘Uncle James wishes to be remembered to you’ — showing that the grandmother had evidently given the message. This is a very rational letter of Mrs. Jones in every line, especially after reading the letter that had been received by her, and considering this as an answer to it. In short, I don’t see how in the world an insane person of any character could have written a letter of this kind.”
We will remark at this time that it does appear, after a study of the evidence, that those with whom the late Mrs. Jones was most familiar (such as members of her family and her servants) were those who discovered the strong symptoms of insanity. With those, doubtless, she was very familiar. She was not guarded, did not seek to control her nerves, and spoke at random, incoherently, perhaps even irrationally, at times. It may be that in their presence she manifested delusions, hallucinations, and illusions, and other symptoms of insanity.
But with those with whom she was not familiar, it may be because of that fact, she restrained herself, controlled her mind, and expressed her ideas in coherent order.
It is only on that theory that the contradictions can be understood; otherwise, they would be bewildering. It would be perplexing to find witnesses from whom the truth is to be expected uttering such conflicting statements.
Friends.
The following witnesses, friends of the deceased, evidently did not think that she was senilely demented:
Of the witnesses, Mrs. A. Poitevant had been friendly since years with her; often conversed with her at her home; some time in the year 1905, in a conversation, spoke about different things, about flowers. Mrs. Poitevant brought a bouquet .to her, which pleased Mrs. Jones very much. Mrs. Poite-vant never found any symptoms of dementia.
Another witness, Mrs. E. W. Smith, a member of the same church, called on her very often. She says that she admired Mrs. Jones very much, being a great friend of her mother; thought a great deal of her. After Christmas, 1905, she called on her and found her quite rational. She (Mrs. Jones) inquired about witness’ mother; said that she was in good health, but in trouble. (At that time the *999 suit for interdiction liad been brought.) Witness said that she hardly knew how to reply, and only pressed her hand, and said that her mother would call to see her.
Mrs. A. A. Bartels had known her since 1888, as a member of the Ladies’ Aid Society. As late as 1904 Mrs. Jones took part in the religious exercises of the society. They would read Verses in turn, and Mrs. Jones read her verses as aptly as anybody else and realized perfectly what she was doing.
Mrs. S. S. Bothick testified as to her sanity. So did Mrs. M. Stockton.
Mrs. George Halbert was associated with her in church work, often visited her during the last year of her life, was always nicely received by Mrs. Jones, and conversed with her. Mrs. Jones was suggestive in the conversation, and kept up its train in a rational manner.
Mrs. M. Green and Mrs. F. A. Harral thought differently.
The former had known her for years. They were good friends. The last year Mrs. Jones would seldom call on her, and when she did she was always accompanied by her brother, James Reid. The old lady had visions and illusions, and she .(Mrs. Green) recounts incidents showing disturbance of mind.
The testimony of the latter witness, Mrs. Harral, agrees substantially with that of Mrs. Gre.en. According to her Mrs. Jones was senilely demented.
Evidently Mrs. Jones was a very pious woman. Right or wrong, the members of her church were beautifully devoted to her.
Before closing our examination of this group of witnesses (that is, the members of the church), we will refer to the testimony of Rev. G. Davis. He was the presiding elder of the New Orleans district and had been pastor of the Carondelet Street Methodist Church. He called on Mrs. Jones frequently, and gives an account of one of his visits, in which he inquired about her fall down the stairway. She said she had lost her footing; that in her suffering condition she lay where she fell for some minutes, not knowing the extent of her injuries; that she knew that her brother would be in soon; that he came in in about ten minutes, helped her to bed, and summoned a physician. Then she spoke of the kindness of her brother, who had always been attentive to her. She referred to some legal notice, and said that she had made a will, which she hoped would not be broken. (The ’-gal notice was of the suit for interdiction.)
Mr. H. M. Harrison, another minister, met her frequently and dined at her home in 1904. She presided at the table. He gave an account of their talk, and was positive' that she showed no signs of dementia.
Among her personal acquaintances a number had never detected the insanity charged. Only a few thought that she was a victim of profound senile dementia. The number of those who had never discovered signs of mental ailment was large as compared to those who thought differently. They are all highly reputable witnesses.
Another Group of Acquaintances.
Among those of the business men who were acquainted with her was John Klein, who was. in the real estate business. He knew something about handwriting, and identified the will of August 11, 1904, and other documents as being in the handwriting of the testatrix. Years before her death he had boarded at her home, and never observed that she was affected by. a touch of insanity.
John W. Blackman, a sugar dealer, had had a number of conversations with her, often ■ relating to business and church affairs. He does not think that she was insane.
Mr. M. O. Soniat, a notary public, was at her home in March, 1905. He passed an act before her. There was nothing unusual. She appeared to understand what she was doing.
*1001 Mr. E. Freret: The following is very suggestive of everyday life: She spoke to him a little while about the weather, and said that she was fairly- well for a person of her age; that she had been acquainted with his grandfather. She appeared somewhat feeble. The room was neat. He did not see anything to raise suspicion of insanity.
Mr. P. J. Garcia was present as one of the witnesses at the confection of the last will— the one by public act. He noticed nothing out of the ordinary about the testatrix. She appeared to him as being in good health.
Mr. Ed. Gregory testified about to the same effect.
The following is suggestive of soundness of mind, testified to by this witness: She was hemming sheets, he said, when he called as a witness with á notary public and others. They were introduced by Mr. Schnei-dau. She arose from her chair and said she was pleased to meet them. James Reid took the sheeting she had and put it on the bed. Mrs. Jones then talked about one thing and another until the notary told her what he had come for and read the papers to her.
Mr. Chas. Schneidau, a notary public and counselor at law, had been her notary during the last years of her life and executed her notarial acts. When the last will was signed by her she appeared of sound mind. She dictated the will from a paper she held in her hand.
Before taking up the testimony of the experts, which we propose to review, the wills attacked will receive our attention. Not to copy them at length, we will state that there is nothing about them or their contents to show insanity.
In the codicil — that is, the last will — she left to her son, James R. Mitchel, the opponent, one-third of her estate. The residue of her property, after paying one-third to her son and after paying other legacies mentioned in the prior will, she left to her brother James Reid and Andrew Jackson Reid, in the proportion of three-fifths to James Reid and two-fifths to Andrew Jackson Reid.
This will is dated August 18, 1905.
The will of October 20, 1904, -to which the olographic will refers, was drawn by the testatrix in the olographic form.
In' taking up the testimony of the experts, we are reminded, in regard to the disease in question, that there is normal old age, and, on the other hand, old age subject to many ailments, among them senile dementia. The authorities inform us that old age begins at 40; with others, at 50.
It will be borne in mind that the old lady was about 75 years of age.
The authorities state that which everybody knows — that some people are old at 45 and others are young at 75; that it depends upon nervous nutrition.
The following are laid down as symptoms of senile dementia:
Beginning at the origin, weak and decrepit old age is fond of the simple and quiet of the fireside; and as the disease progresses the person attacked becomes uninterested. The thoughts become contracted, an abnormally failing memory, dullness and apathy, ideas of place and time fail, and faces are forgotten.’ The conversation becomes childish. The person becomes untidy, untidy even to squalidness. There are moments of depression and moments when the person is highly elated. These conditions continue and grow worse. Then come the illusions, depressions, and hallucinations, softening of the brain, insanity, and dementia, and that which Is worse than the fatal end, the blank mind.
It will be seen that it begins in simple form and ends in complete dementia. The condition of Mrs. Jones’ mind had not progressed to the last stages of that disease.
We will now take up the testimony of the experts for consideration. At this time we desire to state that each of the physicians who has testified is a man of Integrity and *1003 high standing in his profession. They are all men of good faith and in testifying sought to arrive at the truth.
Taking the above definition regarding dementia as a starting point, we take up for review the testimony of one of the experts, Dr. P. E. Archinard. We give only an outline, and state as briefly as possible the result of our examination.
The doctor is one of the prominent physicians of the city and has made a special study of nervous diseases.
In December, 1905, and January following, Dr. Archinard informs us that he examined into the condition of mind of Mrs. Jones; that her conversation was random, her thoughts were incoherent; that she did not even at times recall the name of her attending physician. To quote from his testimony:
“Her whole behavior showed me that she was a woman of some education and a certain amount of mentality, which was gone. It was a case of worn-out brain. There was no lucid interval. She was a dotard — a profound senile dement.”
And the doctor adds that her ailment dated back at least three years. In the course of his testimony he stated that he did not think that a senile dement could compose any number of phrases or sentences, yet a person thus affected might copy a few lines. He also added that she was not in a condition of mind to write the letter of January 1, 1906.
Dr. W. R. Mandeville was also called upon to examine into her mental condition and arrived at the conclusion that it was a case of senile dementia. The doctor declared that he could not state at what time she became senilely demented; that it was impossible for any one to do that — thus disagreeing with his associate in the examination into the condition of her mind. He further said, in substance, that if it were shown that Mrs. Jones knew all of her recent friends and conversed with them upon "ordinary topics that as to her state of mind it would indicate that she was rational; that she might be rational at one time and not rational at another; that he had heard a senile dement talk at one time upon one'subject in a rational manner and suddenly go upon another topic that was not mentioned at all.
Dr. Archinard and Dr. Mandeville were appointed by the court as experts.
Dr. George K. Pratt, a general practitioner and the regularly retained physician of the testatrix since 1902, except during a few months’ absence, treated Mrs. Jones to the date of her death. He was called upon to examine into her mental condition, and says that it showed a change from July 19, 1905, to January, 1906. It was weaker in 1906; but she was not irrational. In November, 1905, on one of his calls, he found her engaged in reading a French newspaper. At his request she read a part of the French newspaper and translated it correctly into English. This and other incidents convinced him that she was possessed of her mental faculties. At any rate, she was not senilely demented.
Dr. A. Moore, who also was her attending physician, took part with Dr. Pratt in examining into her mental condition and arrived at the same conclusion regarding her sanity.
Dr. E. F. Mioton is another expert who testified. He had never met the testatrix, and based his conclusions upon the evidence detailed to him by counsel. He stated, among other things, that a person affected with senile dementia could not have written the olographic will written by the testatrix, nor could she have written the letters introduced in evidence. He added that the best evidence whether a person is suffering from dementia is his correspondence and his acts.
He said, if the testatrix wrote the letters, she was -unquestionably sane. To ex *1005 plain at this time, in connection with his evidence: Mrs. Jones had charged in error (a gross error) that some one had forged one of her checks. She afterwards retracted the charge. This was laid before him, and also the written retraction of Mrs. Jones.
“As to this,” the doctor said, to quote literally, “that the check had never been forged, and during an attack of insanity she had made this statement, and on becoming well she had found out that the statement had been made, it is very possible and probable that she would have issued that certificate. But the time at which she issued the certificate would certainly lead one to believe that she was well at that date.”
We will here state that the forged check incident is not of recent date. It was in the year 1898. But even at that time the contention on the part of the opponent is that she had mental aberration, or at any rate that there were symptoms of dementia.
There are two letters in the record in regard to this check incident. They are kindly, and show the sympathy and feeling which the good mother expressed to her son. We excerpt a few words:
“I fear that I have unintentionally offended you. If that is the case, I am sorry, and' would like for you to let me know in what way I have offended you.”
This letter was shown to the expert. He said that in his opinion it had been written by a sane person.
As well state here, as we come to it in examining the testimony, he said:
“All the authorities agree pretty much, as well as I recollect, that the last medical attendant, the man who treated in person at the date of her death, can give the best evidence in so far as sanity or insanity is concerned.”
It will be borne in mind that Dr. Pratt was her faithful attending physician to the day of her death. He testified that her case was not that of a complete senile dement.
The testimony of another attending physician, Dr. Moore, does not bear out the theory of dementia at the date that the wills were written.
One of the experts stated:
“If it be true that in January; 1906, the doctors appointed by the court examined this lady and pronounced her to be a senile dement at that time, it was not possible to say what was her condition four or five months anterior to their visit.”
The same experts stated positively that there were lucid intervals in case of dementia. At another time the subject arose whether the testatrix could have copied the wills and letters in question. Relative to the copying of these wills, Dr. Mioton’s answer was:
“Copying is not a mere mechanical art. Neither you,” answering counsel, “nor anybody else, can copy anything unless you tax your mind. A senile dement cannot write a will. If he attempted to write it, and was dictated to, and everything in the world favored the dement, if it was one of those mild attacks that are hardly noticeable — in other words, if only those intimate with the patient were aware of it, because it was so mild — then by an effort on the part of the patient he might be able to write a pretty decent will; but I hardly think that it would be a will which would compare with the will which was shown to me. However, in dementia you have lost control of the mind. You might form your letters pretty well, but not write a line. Then you would have great big blank spaces, and you would not dot the i’s, and so on, like a person who is well. In other words, although it is possible to make a person write a pretty fair document, that document would hardly stand scrutiny.”
Dr. Nolte, another expert, concurred in all salient points with the other expert physicians who have testified, and testified that a complete senilely demented person ■ cannot write, even under dictation. He also examined the papers written by the testatrix, and testified that, had she been in a state of complete senility, she would not have been able to write them.
The Asserted Interdiction.
As relates to the interdiction before referred to in the statement of the facts: The contention is on the part of opponent that the judgment has the effect of res judicata.
*1007 In our .view, in the incomplete state in which the judgment was when she died, the judgment cannot have that effect. See In re Jones, 117 La. 106, 41 South. 431.
A similar question was decided in matter of the Lambert interdiction. This court declined to give effect to the judgment of the district court and held that the proceedings were abated. In re Lambert, 115 La. 470, 39 South. 447.
A similar question arose and was decided by this court.
See Doss v. Board, 117 La. 450, 41 South. 720, citing a number of decisions in this and other jurisdictions, including two decisions of the Supreme Court of the United States.
We do not overlook the fact that, in the case in which a judgment was rendered by the district court, the judge of that court, a short time before her death, very properly called upon Mrs. Jones and satisfied himself by a personal interview that she should be interdicted. But the information upon which our learned brother acted and his judgment are not controlling as relates to her mental condition when she wrote the will. She may have been incompetent to manage her business at the time the decision was rendered, and yet she may have been quite capable of making a will at the date of the will.
Under Lock.
The fact that she was locked up in her room has given very good ground to the opponent for very strong argument in support of his contention.
There is uncontradicted evidence that the proponent, whose attention to his sister was constant, resorted to thus locking her up, after the accident before mentioned, in order to prevent another accident to which she was exposed, if in his absence or that of the servants she were to walk about the house alone. Sometimes she and a servant were locked up together in her room — for the sake of her protection, the evidence states. She did not object.
Repeating One’s Self.
We will state here the evidence shows that hers was a failing mind in some degree.
There was mental vacancy, which led her to repeat that which she had often said before. She may have greatly admired flying birds, the petted animals around her to whom she talked; but all these things are not necessarily indications of senile dementia.
The Wills.
We are led at this time to inquire; Did she write the wills, or were they dictated to her in such a way as to vitiate them? In other words, was she devoid entirely of all will power?
The evidence proves, as we think, that they were written in her handwriting. About the dictation, or the asserted overpowering influence, it is very difficult, with the evidence before us, to arrive at the conclusion that such was the case. Unquestionably, the proponent had great influence over her. We understand the issue to be, in the main, that her brother took advantage of her dementia to enrich himself.
It is not sufficiently proven that she was in such a condition of mind, so bereft of reason, as to be entirely at the mercy of her brother and subject to his will and power. We are of the opinion that she had sufficient mind left to dictate her last will and testament. There may have been some insanity. It was not constant. In the early stages, at the least, of the disease, she had many lucid intervals.
This court has decided that, although insanity may be partial, a will may be made. Kingsbury v. Whitaker, 32 La. Ann. 1055, 36 Am. Rep. 278.
*1009 There was senile dementia, not to a degree to invalidate her will. Godden v. Burke, 35 La. Ann. 160; Wood v. Roane, 35 La. Ann. 865.
Not a Reconventional Demand.
Just before the case was closed, counsel for opponent proposed, in order to make the record, to put another expert upon the stand to the end of “submitting to him facts and phenomena” which had been brought out by opponent, since they were forced to close, instead of resting. In other words, the object was, as we understand, to submit all the testimony of the experts to this expert.
A number of witnesses had been heard. About 15 days had been taken in examining them. The application was not granted.
The district court’s refusal to reopen the taking of evidence is in large part left to its discretion. Furthermore, the opponent was a defendant in the proceedings, and the ground urged to set aside the will of the testatrix by this opponent was a part of his defense, and not a reconventional demand. He did not have the right to a surrebuttal.
For the reasons assigned, the judgment is affirmed.