OVERTON, J.
 

 Nancy White Nelson was an old negro woman who resided in New Orleans. She owned her own home,
 
 a
 
 part of which she seems to have rented out. She also owned some personal property, and received a pension from the federal government, which was apparently something more than sufficient, together with the rents she received, to care for her limited wants. Her sister, who was also aged, lived with her, and was provided for by her. Nancy Nelson had no children, and her parents were dead. On February 14, 1919, she made her last will and testament, in nuncupative form, by public act. The will, omitting the formal parts, reads as follows:
 

 “My name is Nancy White, widow of Anson Nelson, have been married but once and then to Anson Nelson. My parents are dead. I have no children. I will and bequeath unto Sandy Jones all the property I die possessed and appoint him executor of this my last will and exempt him from giving bond or security.
 

 “X desire that he care for and look after myself and my sister, Mary Anne Kennedy.
 

 “I have made no other will.”
 

 
 *461
 
 Sandy Jones, the universal legatee, is a colored person, engaged in the ice, wood, and coal business, and was so, engaged at the time the will was written. He was not related to the testator, but was friendly to her.
 

 The testatrix died on June 12, 1924, over five years after she had made the will. Her sister, who was living with her, and who is referred to in the will, died before the testratrix did. ■ After the death of the testatrix, the will was admitted to probate, and was ordered registered and executed. After it was admitted to probate, Mary Williams and Frank A. Payne, who are the niece and nephew respectively of the testatrix, alleging that they are her legal heirs, attacked the will on several grounds for the purpose of annulling it.
 

 One of the grounds of attack is that the forms of law, which the will purports to follow, were not, in fact, complied with, in that the will was not dictated by the testatrix to the notary, in the manner described therein, nor was it read to her as therein stated, nor was it made without turning aside to other acts as therein recited. The evidence fails to establish any of the allegations setting forth this ground. The only one of these allegations, which the evidence adduced justifies us in noticing more particularly is the one relating to the dictation of the will. The law, with reference to the nuncupative will by public act, prescribes that the will “must be dictated by the testator and written by .the notary as it is dictated.” O. O. art. 1578. In this instance in receiving the dictation the notary did not reduce it to writing throughout in the exact words of the testatrix, but in making changes in the phraseology, he did not depart from, but preserved, the exact meaning of the testatrix. The action of the notary in making these verbal changes is not fatal to the validity of the will, especially where, as was the case here, the testatrix was illiterate. Succession of Saux, 46 Ha. Ann. 1423, 16 So. 364; Starrs v. Mason, 32 La. Ann. 8. The notary also, in preparing the will, asked the testatrix questions concerning her matrimonial status, as to whether she had any children, and as to whom she desired to leave her property, but without suggesting or influencing the answer. This also is not fatal to the validity of the testament, where, as here, the testatrix was unlettered, old, and feeble. Thus, in Succession of Riebel, 135 La. 193, 65 So. 106, it was said:
 

 “The dispositions of the will were not dictated by the old lady of her own impulse; but were' elicited from her by questions put by the notary, and answers, on her part, to the questions; and the notary did not write down the questions and answers as spoken, but wrote down their substance, in what he considered to be a more appropriate form, or in notarial style. This mode of proceeding has been held not to violate the codal provision- of dictation, where the questions are not of a character to suggest the answers.”
 

 Another ground upon which the attack is based is that the will, after making Jones universal legatee, reads:
 

 “I
 
 (referring to the testatrix) desire that he (Jones) care for and look after myself and my sister, Mary Anne Kennedy.”
 

 It is contended that this provision takes the will out of the category of testaments and makes the bequest more akin to an onerous donation inter vivos, so made as to assume the form of a legacy, than to anything else. It is contended that this is so, because wills have no effect until the testator dies, whereas the will, in this instance, requires the legatee to assume and fulfill certain obligations. during the lives of the testatrix and her sister, and it is urged that the donation is null, because the donee did not accept the donation during the life of the donor. It is also contended, in this connection, that the provision quoted imposed an obligation upon Jones, which he did not discharge, and hence that the legacy lapsed.
 

 
 *463
 
 We see nothing in the instrument presented to us as a will that makes it in any sense a donation inter vivos. The instrument clearly appears on its face to be the will of the deceased, and being such, it is clear that the legatee, was not called upon to accept, and could not accept, the legacy, until it fell to him by the death of the testatrix. The clause, forming the basis of this attack, is the mere expression of a desire by the testatrix that Jones would care for and look after her and her sister. It seems that he had been kind to the testatrix, and, after the will had been written, he continued his kind attentions, attending to her little wants, frequently stopping to see her while making his daily tours selling ice, but in no sense maintaining either her or her sister, further than to furnish them with ice, free of charge, in the summer time. The record discloses that the testatrix urns not in need of financial help. As to whether or not, as observed by the trial judge, Jones complied with the wishes of the testatrix, she alone was the judge. She possessed the power, at all times, during the five years and more that intervened between the confection of the testament and her death, to revoke the will, and since she did not do .so, it is evident that she was satisfied with what Jones had done, and continued to do up to the time of her death. Her conclusion should be respected.
 

 Another ground of attack is based on a recital in the will and on article 1579 of the Civil Code. The article cited, referring to the nuncupative will by public act, provides that — ■
 

 “This testament must be signed by the testator; if he declare that he knows not how, or is not able to sign, express mention of his declaration, as also of the cause that hinders him from signing, must be made in the act.”
 

 The recital in the will, referred to, reads:
 

 “And at the moment of signing testatrix declared that she knew not how to write but affixed her usual mark.”
 

 The complaint is that the will is null, because the testatrix did not declare that she did not know how to sign her name, but simply that she did not know how to write; whereas, it occurs that some people do not know how to write,, but know how to sign their names.
 

 In Brand v. Baumgarden, 24 La. Ann. 628, the recital in the will was:
 

 “The said testatrix having declared she could not write, made her usual mark.”
 

 The contention there was that the recital was not a compliance with the Code, because the testatrix did not declare that she did not know how to sign, but instead declared that she could not write, but the court held that these words were equivalent to, a declaration that the testatrix did not know how to sign, and were a sufficient compliance with the Code. In Succession of Carroll, 28 La. Ann. 388, the recital was “that the testatrix, being illiterate, has made her mark.” It does not clearly appear whether the testatrix in that case made a declaration to that effect, or whether the notary failed to state that she made such a declaration; but be that as it may, the court did not base its ruling on the absence of such a declaration, but upon the ground that the words, “being illiterate,” were not the equivalent of the words, “does not know how to sign.” Counsel for those attacking the will point to this case as, in effect, overruling the Brand Case, supra. However, the court that rendered the decision in the Succession of Carroll' did not take that view, for it differentiated the Brand Case from the case it was deciding. In our opinion the recital in this case, showing the declaration, is even more specific than was the declaration in the-Brand Case. Here the words are:
 

 “At the moment of signing' the testatrix declared she knew not how to write, but made her ¡ usual mark.”
 

 
 *465
 
 Where a testatrix, at the moment of signing, declares that she does not know how to write, she means that she does not sign because she does not know how.
 

 One of the grounds alleged for annulling the will was stricken from the petition on an exception of no cause of action. The ground is that the testatrix was not “in a rational frame of mind capable of making the said will, being at the time under the control and domination of the said Sandy Jones, who used all sorts of undue influence to force the said decedent in the making of the said will.” The court sustained the exception of no cause of action as to this ground, because it viewed the allegation, setting the ground forth, as showing merely undue influence or captation as a ground of nullity.
 

 The trial court, we think, correctly viewed the allegation. The reason shown by the allegation why the testatrix was not in a rational frame of mind, capable of making the will she made, is not because she was insane, but because she was under the control and domination of Jones, who used all sorts of undue influence to force her into the making of said will. This is merely an allegation showing captation and suggestion or what is termed, at common law, “undue influence.”
 

 In Zerega v. Percival, 46 La. Ann. 590, 606, 15 So. 476, 480, it is said:
 

 “ ‘Captation has been defined as the act of one who succeeds in controlling the will of another, so as to become master of it. Captation takes place by those demonstrations of attachment 'and friendship, by those assiduous attentions, by those amenities, by those caresses, by those ready services, by those officious little presents, usual among friends, and by all those methods which, ordinarily, render us agreeable to others, and enable ns to secure their good will. Suggestion is often used as a synonym for captation, but it is applied specially to those means of persuasion employed to alter the will of a testator, and to prompt him to make a disposition different from that which he had in view. Bouvier’s Law Dictionary, verbo Captation; Furgole, vol. 1, p. 131.’”
 

 Article 1492 of the Civil Code, with reference to testaments, provides that—
 

 “Proof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation.”
 

 In the Zerega Case, from which the excerpt, preceding the last quotation, is taken, it was held that suggestion and captation, although fraud was alleged in connection therewith, could not be proved to annul .a disposition in a will, and an exception of no cause of action was sustained. To the same effect, see Succession of Hernandez, 138 La. 134, 70 So. 63; Succession of Schlumbrecht, 138 La. 173, 70 So. 76. There is nothing in the Succession of Jones, 120 La. 986, 45 So. 965, that supports the position of those attacking the will. In that case, in syllabus No. 9, it is said that, where the influence exercised amounts to “dominating and overpowering control over a mind diseased and without will,” good cause exists to annul the testament. There is nothing in the body of the decision to that effect. However, it may be said as observed, in effect, by the trial judge, that the will in such an instance would be null, not because of the influence exerted, but because of the testator’s insanity.
 

 In our opinion, our learned brother below ruled correctly on this phase of the case. But counsel complains that since the petition shows a cause of action in other respects, the trial judge should have overruled the exception. We are unable to agree with counsel. Where, as in this case, a litigant alleges, among his grounds of complaint, one which is distinct from the others, and does not show a cause of action, the judge does not err in sustaining the exception as to such ground. See Succession of Curtis, 156 La. 243, 100 So. 412. It would be vain, in this instance, to sustain conn
 
 *467
 
 sel’s contention by overruling the exception, when the law says that evidence shall not be admitted to sustain the ground against which the exception is leveled.
 

 It may be here said that counsel for plaintiffs apparently insists that Jones was in the room when the will was written. Without holding that his presence in the room, at that particular time, would have affected the validity of the will, we may say that plaintiffs do not allege that he was present, and that, moreover, the evidence shows, he was not then present.
 

 Counsel for those attaching the will also urge that the court erred in sustaining an objection to certain evidence offered by them. Counsel offered to prove by a Mrs. Johnson that Bocage, one of the witnesses to the will, admitted that he was not present when the will was written. This evidence was offered as substantive evidence, and not as impeaching evidence. In fact, Bocage had not then taken the stand, and hence could not have been then impeached. The evidence was objected to as being hearsay. It was clearly hearsay.
 

 For the reasons assigned, the judgment appealed from is affirmed.