HAWTHORNE, Justice.
 

 Mrs. Marie Pizzati Toro died in the City of New Orleans on February 15, 1948, at the age of 67 or 68, leaving a last will and testament in olographic form dated October .22, 1945, in which she bequeathed all of her property to John Eugene Lindner, Jr., minor son of Dr. John Eugene Lindner, Sr., constituting him her sole heir and universal legatee.
 

 Mrs. Toro left neither ascendants nor descendants, but the execution of her will was opposed by her brother, Salvador A. Pizzati, who contended, first, that the will was invalid because it was not entirely written-, dated, and signed by the testatrix. In the alternative he also pleaded (1) that the will was a forgery; (2) that the testatrix was insane openly, notoriously, and for a long time prior to, and at the moment of, the confection of the will, and continued so until her death; (3) that Dr. Lindner was the physician who treated the testatrix during the illness from which she died, and that for this reason neither he nor his minor son, a person interposed, could inherit by donation mortis causa; (4) that the will was not the free and voluntary act of the decedent, but was written under duress, force, and undue assistance. Finally the opponent of the will opposed the application of Dr. Lindner to be appointed testamentary executor and urged that as the closest living relative of the testatrix he was entitled to be preferred in the appointment.
 

 After a lengthy trial in the lower court, opponent’s contentions were all rejected by the trial judge, and the will was admitted to probate and ordered executed according to law, and Dr. John Eugene Lindner was named dative testamentary executor. From this judgment Salvador A. Pizzati, the opponent, appealed.
 

 In support of his contention that the will was not wholly written, dated, and signed by the testatrix, the opponent evidently relied on the testimony of the operator of a home for the aged and infirm and that of her relatives who assisted her,
 
 *554
 
 who testified that from October, 1945, when Mrs. Toro was admitted to this home, until her death on February 15, 1948, she was unable to write or even sign her name. We are not impressed by this testimony, for in our opinion it was proved beyond a doubt that the will in question was entirely written, dated, and signed by the testatrix. This fact was established by the testimony of the parties who actually saw her write and sign it, as well as by the testimony of Mrs. Peter Spicuzza, who was acquainted with the decedent for over 60 years and had corresponded with her frequently, and who positively identified the will to be in the handwriting of Mrs. Toro. Further, it was conclusively shown that on two occasions subsequent to writing the will the testatrix visted a bank in the City of New Orleans and signed the record of that institution for the purpose of entering her bank box, and also it was admitted without dispute that as late as the year 1946 she signed her name to an affidavit in opposition to an interdiction proceeding brought against her. After our examination of the will itself together with the various exhibits of the testatrix’ handwriting, we are unable to distinguish any obvious differences between the handwriting in it and that in the exhibits.
 

 As to the contention that the will is a forgery, there is no evidence whatsoever to support it, but on the contrary the proponent of the will by competent and sufficient evidence has proved its validity.
 

 We next pass to the question of the testamentary capacity of the deceased. Under Article 1475 of our Civil Code, one must be of sound mind to make a donation either inter vivos or mortis causa. However, testamentary capacity is always presumed ; that is, a testator is presumed to be sane until the contrary is affirmatively established, and a legal presumption exists in favor of the validity of the will. Chandler v. Barrett, 21 La.Ann. 58; Kingsbury v. Whitaker, 32 La.Ann. 1055; Succession of Mithoff, 168 La. 624, 122 So. 886; Rostrup v. Succession of Spicer, 183 La. 1087, 165 So. 307; Succession of Edgar, 184 La. 775, 167 So. 438; Succession of Lambert, 185 La. 416, 169 So. 453; Succession of Stafford, 191 La. 855, 186 So. 360; Landry v. Landry, 196 La. 490, 199 So. 401; Artigue v. Artigue, 210 La. 208, 26 So.2d 699; Clanton v. Shattuck, 211 La. 750, 30 So.2d 823; McCarty v. Trichel, 217 La. 444, 46 So.2d 621.
 

 Whether Mrs. Toro was insane on October 22,1945, the date the will was written, presents for our determination a question of fact, which was resolved against the opponent of the will by the trial judge, and his finding that the opponent had not overcome the presumption of sanity is entitled to great weight.
 

 The testatrix, Mrs. Toro, resided for many years with her husband, Joe Toro, in Clermont Harbor, Mississippi. Her husband died in the year 1943, and thereafter Mrs. Toro resided alone in Clermont Har
 
 *556
 
 bor until about October-15, 1945, when she came unaccompanied to New Orleans by train and was placed in the nursing home by Dr. Lindner.
 

 Acquaintances of Mrs. Toro at Clermont Harbor testified that after her husband’s death and before her departure for New Orleans she did many peculiar things; appeared to suffer from hallucinations, to have lost her
 
 memory,
 
 and to be extremely forgetful and absent-minded in routine matters and transactions; put on her clothes in an eccentric manner, and was unable to care for herself and her physical needs, as demonstrated by her failure to eat the proper foods and by her untidiness. Her attorney in Mississippi testified that he did not think that she had testamentary capacity.
 

 The operator and her assistants at the nursing home where Mrs. Toro was placed and remained until her death testified that during that period she was unable to care for her physical needs, that is, she could not dress or feed herself; was unable to read or write and to recognize individuals or persons whom she knew.
 

 On October 22, 1945, a few days after she was placed in the nursing home, Mrs. Toro visited in the home of Dr. Lindner in New Orleans, and on this occasion the will was written.
 

 Dr. Lindner had been her personal physician for many years but had never charged Mrs. Toro for his professional services. This undoubtedly was due to the fact that the testatrix had lived for many years in the home of Mrs. Lindner’s aunt, and the relations between the deceased and! the Lindner family seemed to be very close. This is further evidenced by the fact that the acquaintances of Mrs. Toro at Clermont Harbor called in Dr. Lindner as a friend-of the family when Mrs. Toro was in need of assistance, and it was due to his efforts-that she was placed in the nursing home. So far as the record discloses, the relations-between Mrs. Toro and her brother were-unfriendly.
 

 Some five months after the will, was written, proceedings were instituted by Dr. Lindner for the interdiction of the testatrix. The testatrix filed an answer, which she-signed, denying that she was subject to-interdiction and asking that the proceedings be dismissed. The psychiatrists who examined Mrs. Toro at this tme were uniable to agree, as two were of the opinion-that she was subject to interdiction and the other that she was not. Thereafter by joint motion of attorneys representing Mrs. Toro and Dr. Lindner the petition for interdiction was dismissed.
 

 Approximately a year after the first interdiction proceeding, another interdiction-proceeding was filed by the operator of the nursing home, and judgment was rendered interdicting Mrs. Toro on July 11,
 
 1947.
 
 The proprietress of the nursing home was-named curatrix of the person-, and a bank in New Orleans was named curator of the finances.
 

 
 *558
 
 We do not give much credence to the testimony of the operator of the nursing .home and her relatives, since the fact was ■established that the testatrix did write the will and it was a sensible and reasonable ■one. Moreover, she came to New Orleans '.unaccompanied, and, after the will was written, she went with Dr. Lindner to the .bank, signed the' bank records for entry to ;a deposit box, and placed the will therein. Further, approximately a month after the .date of the will, she discussed with an insurance agent the advisability of purchasing an annuity, telling him that she wished .to name John Eugene Lindner, Jr., as beneficiary. This discussion took place in the .same bank in which she had a safety deposit box, and on this occasion she again .signed the bank records for entry to the .box, and an inventory of her property was made. According to one of the psychiatrists who examined Mrs. Toro in April of 1946, the proprietress of the home on this .occasion informed him that Mrs. Toro ate .and slept well, cared for herself well, and read and apparently understood what she read. This statement was never denied by .the operator of the home, although it is in direct conflict with her testimony on direct examination as to the condition of Mrs. Toro from the time she arrived at the home 'until her death.
 

 Of the three psychiatrists who saw Mrs, Toro in March or April of 1946, about six months after the date of the will, two testified that • she was suffering from senile dementia, which condition was due to arteriosclerosis. Arteriosclerosis is the thickening of the walls of the arteries, occurring mostly during old age. There is usually inflammation and degeneration of the arterial walls. It frequently accompanies high blood pressure. Maloy, Medical Dictionary for Lawyers [1942], These two psychiatrists were not able to obtain much information from her, and she did not give satisfactory answers to certain questions propounded by them, some of her answers being unintelligent and showing that she was not oriented at that time. One of the psychiatrists who found that she was suffering from senile dementia testified thut he could not say that Mrs. Toro did nó» have testamentary capacity on October 22, 1945, the date of the will, and the other refused to state any opinion as to her mental condition on that date since he had not examined her at that time.
 

 The third psychiatrist found her to be upset and resentful over the interdiction proceedings, but he stated that she talked to him fairly freely about herself, about the long friendship of Dr. Lindner with her and her family, and of the nature of her property. To him her memory seemed to be intact, there was no evidence of any special confusion, and she did not express any ideas which he could say were hallucinatory. This doctor visited Mrs. Toro again in October of 1947, after her interdiction and a few months prior to her death, and according to his report she at that
 
 *560
 
 time showed a marked deterioration since his prior examination in 1946 and was suffering from senile dementia.
 

 If the two psychiatrists who examined Mrs. Toro in April of 1946 were correct in their finding that she at that time was suffering from senile dementia, which was caused by arteriosclerosis, this does not establish or authorize the conclusion that Mrs. Toro lacked testamentary capacity on the date the will was written, approximately five or six months prior thereto. In fact, both of them testified that they could not say' that she lacked testamentary capacity at the time she made
 
 her
 
 will.
 

 In this court senile dementia or senility has been urged in numerous cases as a cause for invalidating a will. See Succession of Jones, 120 La. 986, 45 So. 965; Succession of Schmidt, 125 La. 1065, 52 So. 160; Succession of Reems, 134 La. 1033, 64 So. 898; Succession of Rouquette, 161 La. 155, 108 So. 319; Wilcox v. City of Hammond, 163 La. 489, 112 So. 375; Succession of Mithoff, 168 La. 624, 122 So. 886; Rostrup v. Succession of Spicer, 183 La. 1087, 165 So. 307; Succession of Edgar, 184 La. 775, 167 So. 438; Succession of Lambert, 185 La. 416, 169 So. 453.
 

 In Succession of Jones, supra, the application to probate the will of Mrs. Jones was opposed on the ground that she had for some years prior to the date of the will been suffering from senile dementia, and that she was an interdict. Judgment of the lower court ordering the will probated and executed was affirmed by this, court. In the course of the opinion we had occasion to review the testimony of certain experts who testified in the case, and in. doing so we said:
 

 “The following are laid down as symptoms of senile dementia:
 

 “Beginning at the origin, weak and decrepit old age is fond of the simple and quiet of the fireside; and as the disease progresses the person attacked becomes uninterested. The thoughts become contracted, an abnormally failing memory, dullness and apathy, ideas of place and time fail, and faces are forgotten. The conversation becomes childish. The person becomes untidy, untidy even to squalidness. There are moments of depression and moments when the person is highly elated. These conditions continue and grow worse. Then come the illusions, depressions, and hallucinations, softening of the brain, insanity, and dementia, and that which is worse than the fatal end, the blank mind.” [45 So. 970]
 

 The testimony of the experts in the instant case is substantially the same. The court in that case concluded: “It will be
 

 seen that it begins in simple form and ends in complete dementia. The condition of Mrs. Jones3 mind had not progressed to the last stages of that disease.”
 

 In all the cases above cited in which senile dementia was urged as a ground for the invalidity of a will, this court concluded
 
 *562
 
 from the testimony adduced that this disease had not, on the date the will was written, progressed to such a state to render the testatrix mentally incapable of writing a will. In the instant case, we do not think the evidence adduced has over•come the presumption of testamenary capacity as of the date the will was written. If the testatrix was suffering from senile ■dementia as early as October, 1945, the evidence does not show that it had advanced to the stage at which she was incapable of making her will.
 

 Appellant contends that, habitual insanity having been established, the burden ■ of proving the sanity of the testatrix at ■the moment of the making of the will ■rests upon its proponent. The answer to ■this is that it was not established that she was habitually insane prior to the making •of the will.
 

 In support of his contention that John Eugene Lindner, Jr., cannot inherit by ■donation mortis causa, opponent relies on .Articles 1489 and 1491 of the Civil Code. Article 1489 provides that doctors of physic ■or surgeons who have professionally attended a person during the sickness of which he died cannot receive any donations inter viv'os or mortis causa made in ‘his favor by the sick person during that sickness. (There are expections to this ■provision, but they have no application here.) Article 1491 provides that every disposition in favor of a person incapable ■of receiving shall be null, whether it be disguised under the form of an onerous contract or be made under the name of persons interposed, and that the father and mother, the children and descendants, and the husband or wife of the incapable person shall be reputed persons interposed.
 

 Appellant contends that Dr. Lindner was the physician who attended Mrs. Toro during the sickness of which she died and was therefore a person incapable of receiving, and that his minor son was a person interposed. The appellee denies that Dr. Lindner treated the decedent during her last illness, and contends that her last illness had not begun when Dr. Lindner ceased treating her. •
 

 From March of 1946 until the death of the testatrix in February of 1948, almost two years, Dr. Lindner never saw or treated her as a physician. From December of 1947 until her death, Mrs. Toro was treated by a general practitioner who visited her numerous times. According to this physician, the terminal cause of her death was pneumonia, and the patient was suffering from high blood pressure with all of its characteristic abnormalities; the first factor that caused death was mental senile deterioration which prevented her from carrying on her normal living processes. The doctor explained that in such cases the patients cannot move in bed, and their lungs are not properly aerated, and that it was due to these conditions that Mrs. Toro developed the pneumonia which was the terminal cause of death.
 

 
 *564
 
 Our appreciation of the cause of Mrs. Toro’s death is that she was suffering from the chronic diseases arteriosclerosis, senile dementia, and high blood pressure that induced the pneumonia which was the immediate cause of her death. The question which we must determine is whether Dr. Lindner treated her during her last illness, and to determine this we must decide when her chronic diseases developed into the sickness of which she died.
 

 So far as we can ascertain, the courts of this state have never had occasion to discuss this problem. The courts of France and the French commentators, however, have discussed it at some length. Article 909 of the Code Napoleon is comparable to Article 1489 of our Civil Code. A translation of that article, 3 Louisiana Legal Archives, Compiled Edition of the Civil Codes of Louisiana, Part 1, pp. 816, 817, is as follows:
 

 “Doctors of medicine or surgery, health officers, and pharmacists, who have professionally attended a person during the sickness of which he dies, cannot receive any benefit from donations
 
 inter vivos
 
 or by testament made in their favor by the sick person during that sickness. * * * ”
 

 Counsel for appellant in brief have given us a translation of a comment of Baudry-Lacantinerie and Colin in their work on Civil Law, which they cite as Volume 10, p. 242 et seq. The following excerpt is pertinent to a case involving chronic illness :
 

 “Article 909 prescribes two essential circumstances which must concur to disqualify a physician from benefiting from-the will of his patient, namely, (a) he must have treated the testator, for the illness-from which he died; (b) the will must be-made during the illness from which the-testator died. ■
 

 “The Treatment. The existence of the-first condition depends on what is understood as medical care or treatment. * *-
 

 “Last Illness. The will must be made during the illness from which the testator-died, under Article 909.
 

 “The incapacity to receive does not exist if the will is made before the beginning, of the illness from which the testator died-Or if the testator died of a different cause,, such as by accidental fire. * * *
 

 “Application of this second conditiom presents some difficulty in cases where the sick person dies of one of those chronic, illnesses, the development of which may extend during many years.
 

 “In such a case it is generally agreed’ that it is the only final painful period which should be considered as being covered by. the article. *
 
 * *
 

 “Plowever this may be, there resides in-the trial courts a sovereign appreciation of the fact's and circumstances of each case,, which is followed by the appellate courts- * * * All the authorities are in accord- * * * ” (Italics ours.)
 

 
 *566
 
 Appellant also cites a case from the Imperial Court of Paris, decree of March •8, 1867, reported Dalloz (1867), Jurisprudence General, Periodical Collection of Jurisprudence of Legislation and Doctrine, Part 2, pi 145, in which the testator died irom tuberculosis. The translation given us by counsel discloses that the will in that ■case was declared invalid, but that in the course of the opinion therein the court, in ■discussing the last illness within the meaning of Article 909, had this to say:
 

 “The last illness, in the naming of Article 909, Code Napoleon, specifically of ■one suffering from tuberculosis, may be •considered as having reached its height, at rthe time arrived when the condition of the patient defies all the efforts of the phy.sician, and permits only of palliatives and •distractions for the preoccupation of the patient.
 

 “It follows, therefore, that the patient -cannot from that time make any donations ■or legacies to the physician, who, having treated him previously, continued to treat ihim since his condition became hopeless.”
 

 Marcadé, in his work Elémens du Droit Civil Frangais (3e éd.), t.‘ 3, p. 466 et seq., in discussing Article 909 stated that' two ■conditions are required in order to strike with nullity dispositions made by a sick person to the profit of doctors who have treated him. It is necessary, first, that the disposition be made during the illness in which the attendance is given, and, second, that the disposer died of that illness. It was Marcadé’s view that, from the moment the disposition is recognized as made
 
 during the illness
 
 of which the disposer
 
 died,
 
 it must necessarily be annulled. He discussed an opinion of one of the French courts which maintained the validity of a will written by a sick woman in 1820, wherein her doctor was named legatee, in which the court reasoned that the illness, not very grave then, had not assumed a dangerous character, and did not necessitate the treatment of a doctor until from 1824 to 1826, the date of her death. Marcadé was of the opinion that the reasoning of the court was erroneous under the meaning of Article 909 of the Code Napoleon, but that the court could have, very well maintained the legacy by finding that, the treatment of the doctor not having become necessary until in 1824, it was.only at that time that the illness had
 
 begun,
 
 and that up until that time the condition of the testatrix presented only an indisposition and did not constitute
 
 the illness of which she died;
 
 that, if the court had thus declared that the will had been made at a time when the disposer had not yet been stricken with the illness of which she died, the decision would have been well conceived.
 

 Laurent, in Principes de Droit Civil Français (3e éd.), t. 11, n° 343, p. 468, seemed to be somewhat of the same view as Marcadé. He stated that it is necessary, in order that a sick person cannot make a disposition to the profit of his doc
 
 *568
 
 tor, that he make the disposition during the illness of which he died, in favor of the doctor who treated him during the course of that illness. When the illness of which the sick person dies is well characterized, Laurent continued, there is hardly any doubt of it; but, when there is a long illness, which at times seems to give hope of recovery until it finally becomes aggravated and brings death, the question arises whether the illness of which the sick person dies commences with the first symptoms which reveal it, or whether it dates only from the day when it has become definitely fatal. Laurent himself preferred the strict interpretation. He pointed out that there are decisions of the French courts which appear to be in opposition to the interpretation which he gave to the article of the Code, but stated that in such cases it is necessary to take account of the circumstances of the particular case, for the question is one of fact as well as of law. For instance, in the case of the testatrix who died of cancer, did the illness come upon her at its first manifestation, which at first was a lump the size of a lentil and ended by becoming a cancerous sore ? The decision was given in the negative, because, in the beginning, the illness did not require any treatment, so that it could not be said that the ordinary doctor would have treated it, and the case was therefore not within either the letter or the spirit of the law. He further commented that a state of ill health which lasts 14 years, and which can last for life, is not an illness of which the sick person died. In one case the alleged sick woman died at 87 years, without its having been proved that, in the last-14 years which preceded her death, she-had had an illness, properly speaking. One-dies at that age, said Laurent, because one-has come to the end of life.
 

 Thus it will be seen that in dealing with chronic illnesses, the duration of which may extend over many years, the view of Baudry-Lacantinerie and Colin was that the last illness begins, within the meaning of the article, in that final, painful period' which precedes death. Marcadé was of' the view that in such cases the last illness-begins from the time the treatment of a doctor becomes necessary, and that until that time the condition of a testator presents only an indisposition and does not constitute the illness of which he dies.. Laurent, as we have stated, gave a strict interpretation to the article even in cases. of chronic illnesses, but recognized that' certain cases do not come within the letter and spirit of the article because of particular circumstances and facts — as, for example, where the will was written during the existence of the disease which caused, death but before it required any treatment, by the doctor.
 

 Dr. Lindner was Mrs. Toro’s physician-for a period of 15 years. During this time-he never treated her, so far as he could' remember, for anything except high blood' pressure until she came to the nursing.
 
 *570
 
 home in New Orleans on or about October 15, 1945, and from this time through March of 1946 he treated her for high blood pressure and malnutrition. The will, as heretofore pointed out, was written during this period, on October 22, 1945.
 

 Can it foe said that Mrs. Toro’s last illness began at the moment when her blood pressure became high? To us it would seem absurd to say that, in certain types of chronic diseases, which may begin in a mild form, such as high blood pressure, and get progressively worse over a long period of years, say, 15 or 20, the decedent had the sickness of which he died at the very inception of the high blood pressure. Certainly such a conclusion is not within the spirit or meaning of Article 1489 of our Code. The difficult problem, of course, is to determine at what point the high blood pressure becomes so serious that the last illness begins.
 

 One of the doctors who examined Mrs. Toro in April of 1946 made a complete physical examination, and testified that her physical condition was good and that her blood pressure was not high for her age. The physician testified also that the diseases which Mrs. Toro had were of the type that would get progressively worse. Another physician stated in his report that her physical condition appeared to be “OK”.
 

 We are further impressed by the fact that, so far as the record discloses, from March of 1946, the last time Mrs. Toro was treated by Dr. Lindner, until December of 1947, almost two years later, when the physician who attended her until she died was called in, she did not require the attendance of a'physician for any purpose. Under these circumstances, we cannot find that her chronic disease, high blood pressure, had progressed so that treatment by a physician was
 
 required
 
 when Dr. Lindner stopped treating her. Consequently the chronic disease had not at that time developed into the sickness of which she died, and therefore he did not treat her during her last illness.
 

 Under the facts and circumstances of this case, her condition at that time did' not come within the meaning of “last illness” or “sickness of which a testator died” as these terms are interpreted by any of the French commentators whose views we have set out above. Certainly Dr. Lindner was not Mrs. Toro’s physician in that final, painful period which preceded her death. Nor, so far as this record discloses, had her disease progressed to the state where the attendance of a physician was required when he last treated her. Further, the course of the disease in this case is similar to one of those chronic illnesses which, as pointed out by Laurent, do not fall within the letter and spirit of the article of the Code because of the particular facts and circumstances.
 

 In conclusion on this point, we might say that all cases of this nature must be decided on their own facts and circum
 
 *572
 
 stances, and from the facts and circumstances of the instant case we conclude that Dr. Lindner did not treat Mrs. Toro during the sickness of which she died. His son is therefore not barred by the provisions of Articles 1489 and 1491 of the Civil Code from inheriting under the will.
 

 With reference to the question of ■whether the will was written under duress, force, and undue assistance, counsel for •appellant recognize the provisions of Article 1492 of our Code that proof is not ■admitted of the dispositions having been made through hatred, anger, suggestion, or ■captation, but contend that under the jurisprudence duress or influence can be shown ■provided that it occurred at the actual moment of making the will. Even if we con■cede that counsel are correct in their contention, there is no evidence whatsoever which discloses that at the time the will was written Mrs. Toro was under duress, force, and undue assistance from any party ■or parties.
 

 The judgment of the district court •appointing Dr. Lindner testamentary executor is correct. Under Article 1042 of the Civil Code the preference in the choice ■of administrator shall be given to the beneficiary heir over every other person if he be of age. Under Article 1665 a minor ■cannot be a testamentary executor; even with the authorization of his tutor or curator, but under Article 1044, if all the beneficiary heirs are minors, their tutor can claim the preference for the administration. The beneficiary heir is one who accepts the succession with benefit of inventory, Article 883, and under Article 977 a minor must always accept with benefit of inventory. Under these codal provisions the legatee in this.case, John Eugene Lindner, Jr., a minor, is a beneficiary heir, and his father is entitled to be appointed executor.
 

 For the reasons assigned, the judgment appealed from is affirmed at appellant’s costs.
 

 MOISE, J., recused.