## No. 7425.

### MARTHA A. STARRS VS. W. R. MASON, EXECUTOR.

An inquiry made by a notary to a testatrix, while inscribing the latter's nuncupative will, asking if her property was worth a certain sum, was in no way calculated to change or modify her intentions, and hence is not a sufficient ground to annul the testament.

The mere fact that a nuncupative will contains words which were not used by the testatrix in dictating the will, will not affect the validity of the testament, when it is shown that she lucidly expressed her intentions, and that the notary faithfully recorded those intentions in the will.

The pause made by a testatrix after dictating each clause of her will, in order to allow the notary time to write down her words, and her conversing with others during those pauses, do not constitute such an interruption as will affect the validity of the will.

APPEAL from the Second District Court, parish of Orleans. *Tissot,* J.

*Ed. Phillips* for plaintiff and appellee.

*Simeon Belden* for defendant and appellant.

Ed. Phillips, for plaintiff and appellee, contended :

First—That the will was not valid, because it was *not* dictated to the notary in the words contained therein.

Second—That words and dispositions are contained in the instrument which were not dictated or used by the testatrix or by any one present.

Third—That the will was not written as dictated.

Fourth—That the will was not dictated at all by the testatrix.   That it was merely copied from a former will.

Fifth—That the testatrix made no declaration whatever after the reading of the will.

Sixth—That it was not entirely written without interruption or turning aside to other acts.   C. C. 1578.

S. Belden, for defendant and appellant, contended :
That the facts alleged by the plaintiff were not proved.

The opinion of the court was delivered by

DeBlanc, J.   The plaintiff—a niece of the late Hannah Johnson—brought this suit to annul the nuncupative testament which, on the 24th of June 1873, the deceased made by public act, passed before a notary of this city.   Her action is based on three grounds :

1st.   That—at the date the testament was made—Mrs. Johnson was an imbecile, and—in disposing of her estate as she did—was prompted by improper influences.

2d.   That the original act by which her will is evidenced, contains interlineations, pencil-marks and additions which are not on the copy filed in the probate court, and which were neither dictated nor sanctioned by the testatrix.

3d.   That the instrument purporting to be the will of the deceased was not dictated by her, but by other persons, and embodies—not her wishes—but the suggestions of interested parties, as to how she should dispose of her estate.

I.

The testimony of every one of the witnesses examined on the trial—one of them was the physician of the deceased—leaves no doubt that, though weakened by age and by violent spells of asthma, Mrs. Johnson never was insane, and could have—at any time before her death—freely conceived and clearly expressed the most rational wishes.   Her legatees are the children she adopted after the loss of her own, and it was shown that, until her last day, those adopted children were as kind as friendly to her.   It evidently was their regard and affection for her, which prompted the dispositions which she made of her estate, and the charge that they were procured by improper influences is not sustained by even plaintiff's own declaration.   The district judge so held.

II.

The deceased made two wills, one which—it seems—did contain interlineations and erasures, and another one, by advice of the notary who had prepared the first, for the purpose of avoiding any contesta-

tion, on account of those erasures and interlineations. The former was revoked, the latter probated, and that which was probated, which alone is and could have been attacked, was carefully drafted and is free from such irregularities.

### III.

Though the Code expressly provides "that proof should not be admitted of the dispositions having been made through hatred, anger, suggestion or captation—C. C. 1492 (1479)—plaintiff did, without objection, attempt, but signally failed—as we have already said—to prove that the last dispositions of the deceased have been induced by any reprobated captation.

Was she more successful as to the alleged suggestions on which she relies to annul the testament? We think not. J. G. Gernon, her own witness, testified that, when the notary who had written the previous will, and was writing the other, came to that part of the latter wherein it is declared "I consider myself worth at the present time four thousand dollars," he looked at her, but she couldn't exactly state how much she was worth. He then inquired "about four thousand dollars," and she said yes.

The suggestion which—heretofore—was prohibited by law, and which has not ceased to be morally improper, was that which amounted to an artful insinuation, and which was so shaped as to influence the testator's will and procure a particular *disposition*, one which—otherwise—he would not have thought of, or made. The inquiry by the notary as to whether the property which he knew was worth four thousand dollars, was—in no way—calculated to either change or modify the intentions of the testatrix, and—at no time—would have been considered as a sufficient cause to annul a testament, the validity of which could not have been affected by any answer to that inquiry.

9 L. R. 470.

As to the most important points in this controversy, the lower court said : "It is clear, from the testimony of Gernon, that the will was not dictated by the testatrix, as stated by the notary, and that interruptions occurred during the dictation."

Gernon is an attorney-at-law and the son of the notary before whom Mrs. Johnson made the two testaments already alluded to. To facilitate his father in preparing the last one, he procured a copy of the first, and added to it a memorandum, to the effect that the executor of the will was to be dispensed from furnishing bond and security. He swore that Mrs. Johnson declared to the notary, and that the notary wrote under her dictation that she appointed W. R. Mason as the executor of her will, and that he then copied from his—the witness'—memorandum, "that said executor was dispensed from furnishing bond and security."

W. R. Mason swore that Mrs. Johnson told the notary that she wanted him to have full charge of her property after her death, without giving bond or security, and the notary wrote that clause as it appears in the act. He is fully corroborated by two disinterested witnesses— Matthews and Ross—who swore, as positively as he did, that Mrs. Johnson said he should have full charge of every thing, without bond or security.

As to the alleged fact that the testament was not dictated by Mrs. Johnson, Gernon testified :

That she told the notary that she was about sixty-eight years of age, had been married, and that the children born of her marriage were dead.

That she named her legatees, mentioned what she gave to each of them, and designated Mason as the executor of her will.

That, excepting the words " without bond and security," she dictated, and the notary substantially wrote as dictated, the whole of the testament, which was read to the testatrix and witnesses.

It is urged that the act contains language which she did not use. That is so. For instance, she did not say, as written in the act, " I give and bequeath," but merely " I give." Less that, she appears to have lucidly expressed every one of her intentions, and those intentions were faithfully recorded by the notary. They mean as recorded by him, precisely what they meant when they fell from the lips of the testatrix.

More than fifty years ago, this Court said : " We know that there have been decisions in some of the courts of France, requiring the utmost precision in the amanuensis ; but we are unable to adopt this doctrine in its utmost extent. It is desirable to have, as much as possible, every word taken down from the testator's mouth, but we can not adopt the unqualified proposition, that the slightest variation is fatal ; as, for example, the substitution of the pronoun *which*, instead of *that*. This would destroy almost every will."

6 N. S. 146.

" The commentators agree on the principle, that it is the identity of thoughts, and not of words, which the law requires."

" Au reste, pour qu'un testament soit réputé avoir été dicté par le testateur et écrit par le notaire *tel qu'il a été dicté*, il n'est pas nécessaire que le notaire se soit servi identiquement et matériellement des expressions employées par le testateur ; en d'autres termes, qu'il ait écrit *mot à mot* ce que celui-ci a dit : il suffit qu'il ait écrit les dispositions du testament à mesure que le testateur les lui dictait, sans les étendre, les restreindre, ni les modifier en aucune manière."

Toullier, Dt. c., vol. 5, No. 419. Coin Delisle, No. 18.

Duranton, vol. 9, No. 77.

As to the pretended interruptions, what is the evidence ? Gernon was asked : how many times did the notary interrupt her while she was dictating ? He answered : every time she came to a bequest. In this, he agrees with Ross, who testified that " the testatrix spoke slow, and as the notary would write down her words, he would read a line off— she would say again, and he would again write, and so on." While the notary was writing, the old lady conversed with him, remarked that it was warm, or something of that kind.

That evidence, far from establishing such an interruption as would vitiate the testament, shows that it was dictated, written, read and approved clause after clause ; and it was during the intervals which followed the dictation, and whilst the notary was writing what had been dictated, that the testatrix spoke to the witness.

" Par le mot *actes*, sans divertir à d'autres actes, on entend affaires, *negotia*. On peut donner au testateur malade un breuvage, le panser, s'il est blessé ; mais on ne pourrait pas interrompre ces formalités pour passer un bail, une vente, une procuration, ou même pour écrire une lettre."

Pandectes Françaises, vol. 9, p. 36.

" Unity of action and time is all that is required by the provisions of our Code, and it has not been shown that, in this case, there was a division of either, or—in other words—that any thing foreign to the will, intervened to disturb that unity."

In " Chardon's Heirs vs. Bongue," this court said : " After the first bequests were written, the testator became silent, and for a considerable time ceased to dictate, and the notary stopped writing. How long this cessation lasted is not clearly shown ; the notary stated it was less than an hour and a half. The witnesses and notary remained in the room, and the delay was attributable either to the feebleness or indecision of the testator. In the mean time no other *business* was transacted. This, it is contended, was an interruption which vitiated the testament. We can not yield our assent to that proposition. A mere suspension of the proceeding, in consequence of the weakness of the testator, or his want of decision, or to give him time to collect his thoughts, or to reflect maturely on the disposition of his property, does not amount to an interruption in a legal sense of the word. It might be, on the contrary, evidence of greater deliberation on the part of the testator."

9 L. 470, 463 ; 12 A. 605.

" In support of the will, we have the act itself, duly certified under the official sanction of a public officer," fortified by the oath of two of the subscribing witnesses, and that of the executor—and, in contradiction of *only one* of its clauses—that which dispenses the executor from furnishing bond and security—there is but one declaration, that of Ger-

non, who might not have heard what the three others swore they did hear, and—under these circumstances—we can not, by annulling her will—disregard the twice expressed and twice recorded wishes of the deceased.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from is annulled, avoided and reversed, and plaintiff's demand rejected at her costs in both courts.

Rehearing refused.