The opinion of the court was delivered by
Miller, J.
This is a suit by the legal heirs of Margaret Hennessey, to annul her asserted will in nuncupative form by public act. The grounds advanced in the petition, we understand from the argument in this court, to be confined now to those that deny she dictated the will or signed it in the presence of the witnesses, or that she was in a condition to enable her to make a will, or that the act itself contains the recitals by the notary essential to give validity to acts of last will by public act. The appeal is by plaintiffs from the judgment maintaining the will.
The will assailed bears date the 18th of October, 1894. It was preceded by wills at different periods stated in the will of 1894, to be revoked. In all these wills there are bequests to charitable institutions. In the last will the amounts of previous bequests of this character are changed; one or more are omitted, and in the will of 1894 the testatrix makes provision for other charities not mentioned in *1380 previous wills. In one of her previous wills she constitutes three of her relatives her universal legatees; in a like will of later date she omits this residuary provision and names one of them her executor; in her last will, the bequests to charitable institutions being increased, there is no residuary legacy, and instead, of the relative named executor in her previous will, she appoints one of the present defendants, made executor, too, in the will first executed.
The variances in these wills, all made within the year, have been the subject of discussion in plaintiff’s briefs, in connection with the question of the mental condition of the testatrix. As significant on the point, it is brought to our notice she denied in a newspaper publication that she had signed or made any previous wills. Then, too, we have a mass of testimony tending to show the testatrix was addicted to the immoderate use of liquor, and was supplied with it on the morning of the day of the making of the will in controversy. In view of the withdrawal of the attack on the sanity of the deceased, the testimony as to drunkenness, the great age of the testatrix, and tending to show that advantage was taken of her infirmity, must all be deemed to refer to her condition, or rather her capacity as affected by drink. To all this testimony we have given attention. While there is testimony that she used liquor freely, there is also the testimony of a number of witnesses w-ho were brought in contact with her, and the current of their statements is that she was intelligent and entirely competent to manage her affairs. It is true that some of these witnesses saw her only occasionally, others had better opportunities of knowing her capacity, and if drink had destroyed her mind, or affected her testamentary capacity, it is our conclusion it could not have escaped the attention of even the casual visitor.
It will not, however, be contended the excessive use of liquor will, of itself, disqualify the party for making a will. The text writers restrict the inquiry on this point to the testator’s condition when the will was made. The testamentary capacity exists unless the testator “ is so excessively drunk as to be bereft of reason,” and, it is added, “although his understanding is obscured and his memory troubled, yet ho may make his testament.” The testimony in this case, in our view, falls far short of any exigency requiring the application to the full extent of the tests of competency laid down by text writers. Mr. Jarman adds, to avoid a will for insanity produced by *1381 drink “the testator must be so excited by liquor, or so conduct himself at the time of the particular act, ás to be at that moment legally disqualified from giving effect to it.” 1 Jarman on Wills, pp. 54, 55 et seq. Our Supreme Court, dealing with the •question at an early period, adopted the same view in maintaining a will. Hart vs. Thompson’s Executor, 15 La. 88. As to age as a disqualification, the language of Chancellor Kent, in reference to a will of a testator between ninety and one hundred years, is quite pertinent, “ the law looks only to the competency of the understanding, and neither age, sickness, distress or debility will affect the capacity to make a will.” 5 Johnson’s Chancery Reports, p. 148, cited by Mr. Jarman. The tenor of the previous wills made by the testatrix carry impressiveness on this branch of this case. While legacies to relatives are changed in amount, those made in one, omitted in another; additions in legacies to relatives introduced in her last will contrasted with that immediately preceding, there is in all the wills an appreciation evinced for the ties of kindred. In the first and last will she names the same executor. In all the wills there is exhibited a strong religious sentiment in her bequests to churches, and the equally prominent inclination to aid public charities is shown from the first to the last will, in which the legacies of this character are so increased as to absorb, we infer, her entire property, explaining the omission of the residuary legacy in one of her wills. The general consistency of purpose, and in the main exhibited toward the same persons and objects, in our view, furnishes no aid to the conclusions of a disordered mind and consequent incapacity for testamentary disposition. W hile we have considered the phases of the discussion on this subject, at last, the controlling force must be given to the direct testimony of the testatrix’ condition at the time she made this will of October, 1894. It is not of ready acceptance that the official charged with the important duty of receiving and transcribing last wills would go through the worse than form of taking the dictation of an intoxicated person. We have gone through the testimony of those whose opportunities enabled them to know her condition when she made this will. Without unnecessary detail, it may be said that testimony establishes she was not intoxicated, but sober. The concurrent testimony of the notary, the witnesses and the executor present at the time, not varied or affected, in our appreciation, by any testimony in the *1382 recor'd, is, in our view, conclusive on the issue of sobriety when the will was made.
The nuncupative will by public act must exhibit on its face compliance by the notary with the requisites of the law. Civil Code, Art. 1878. Another contention of plaintiffs is, the will bearing the mark of the testatrix, it does not appear from the certificate of the notary the mark was made by her. The preliminary question is whether any mark at all was necessary. The certificate contains the statement that in answer to the notary’s request for her signature, she declared she was illiterate, did not know and never knew how to write, but would make her mark. It is urged on us that the mark of a party who can not write must be treated as his signature, and in this connection there is an elaborate citation of authority from the decisions of other States, and some drawn from our own jurisprudence. But these authorities deal with contracts requiring the signature or an equivalent. Civil Code, Art. 2234. Whether in a will of the kind under discussion the mark of the testatrix is essential, is to be determined by the articles of the Code dealing with the testaments and with the aid of the authorities explanatory of these articles. In the mystic testament the signature of the testator is exacted, and it is naturally accompanied with the denial of that form of will to those who can not write or sign their names. That will may be written out of the presence of the notary in the presence of the witnesses. There is an obvious reason that will should carry the guarantee of the testatrix’ signature. Civil Code, Art. 1384. In the nuncupative will, under private signature, the provision is, it must be signed by the testator if he knows how or is able to sign, or at least by two of the witnesses, if all of them can not sign, to whom the testator presents the paper with the declaration it contains his last will. Civil Code, Art. 1581. The nuncupative will by public act, the Code declares, “must be signed by the testator; if he declares he knows not how, or is not able to sign, express mention of his declaration and of the cause that hinders him must be made in the act. Civil Code, Art. 1579. The articles of the Code would seem to carry the plain implication that the declaration of the testator of ignorance or inability how to sign takes the place, without any mark of the testator, of the signature required of testators who can sign their names. Undoubtedly, it is usual for the testator to affix his mark when he knows not how or is unable to sign, but the *1383 articles of the Code do not embrace the requirement. The obvious conclusion is, we think, that when the signature can not be affixed, the law makes the testator’s declaration of inability, and its cause attested by the notary, the equivalent of signature. This is the conclusion of the French commentators as Boilleux puts it: ‘Si le testateur declare qu’il ne soit ou ne peut signer, le notaire doit faire mention expresse, et cette mention produit le mtme effet que la signature.” 4 Boilleux, par. 974, p. 103. It is pertinent on this branch of the discussion to make allusion to the controversy of the commentator whether any mention of the signature is requisite to be made by the notary, when the testator does sign. ’ Neither our Code or the Napoleon Code includes the signature among the requisites to be mentioned in the certificates. Code, Art. 1578. Napoleon Code, Art. 972. Marcadé and Coin De-Lisle maintain no such meation is necessary. The point is discussed by Laurent with evident leaning to the view of the two first named. Marcadé, 4th Vol., p. 22; 13 Laurent, p. 360. But as we hold no mark was essential, it serves no purpose to continue the discussion whether the certificate should contain any recital on the subject.
It is claimed also that the certificate does not show that the declaration of the testatrix of inability was made and received by the notary. In Shannon vs. Shannon, 16 An., p. 9, the decision turned on the question whether there was any declaration at all by the testator, not whether it was made to the notary. The court held the certificate was insufficient. In the case of Connor vs. Brashear, 25 An. 663, the point was the certificate did not state the presence of the witnesses when the will was dictated. In the Succession of Wilkins, 21 An., p. 115, the will was annulled, because the certificate stated neither reading or dictation in the presence of the witnesses. The decision in Succession of Vollmer, 40 An. 593, holds that the certificate must show the competency of the witnesses. The question here is different from those presented in these cases cited by plaintiff. We have already given the certificate of the notary. It recites the request by the undersigned notary of the testatrix to sign; that she declared in the presence and hearing of the witnesses her inability, assigning the cause that she did not know and never did know how to write or sign her name, but would make hex-mark. Civil Code, Art. 1579. The French authorities dwell on the relation between the request “ interpellation ” by the notary to the *1384 testatrix to sign and her answer. The certificate states the question by the notary and the reply of the testatrix — i. e., her declaration of inability. It is urged that, for aught that appears, the declaration may have been made when the notary was no longer in the room. The fair import of the certificate is, we think, that the request to sign was immediately followed by her answer to the notary from whom the request came. In Dalloz and Fuzier-Herman, Codes “ Annotes,” we find the frequent reference to certificates conveying the declaration of inability to sign by the testator to the notary, couched in language not dissimilar to that of this will. 1 Fuzier-Herman, pp. 35, 36, 39 et seq.
It is strenuously contended this will was not dictated by the testator. By this is meant not that the certificate does not state the dictation, but in point of fact there was none. There is no room for any contention as to the facts connected with this question, and all that is contained in the mass of testimony in the record may be gathered from one, with all sufficient distinctness, without the long repetitions we find from the other witnesses. There are minor points on which the witnesses differ, or in respect to which their statements vary, but there is in the testimony of all the witnesses a substantial concurrence on this subject. It appears that the testatrix, having already executed three wills, conceived the purpose to make that now in controversy. She had announced her design to change her will, and on the day appointed she and the notary went over the will of 1893; she indicated the changes to be made and the additional bequests she proposed to make. We gather from the testimony of the notary he noted her wishes, making the memorandum on the will of 1893 before him, or a separate paper. Then she followed his phraseology in dictating her disposition. It is, we think, the result of the testimony that in this method the notary had come to a full understanding with the testatrix as to the will he has to receive. His statement substantially is, he and the testatrix went over the will of 1893, line by line, section by section, she made the corrections she wanted, and he noted the changes and then proceeded to make the will. From the point in the beginning of the will, “ My name is Margaret Hennessey,” the notary testifies, she commenced to dictate, he asked if she wanted him to assist her in phrasing the will, she replied, she did, “ and she repeated the phrases with me, she repeated each thing with me.” *1385 As another witness, her executor, present when the will was made, substantially puts it, the testatrix, the notary and witness had a conversation before the will was made, she then and there stated the disposition she desired to make, and the notary took it down preparatory to making the w.ll, that is, he made the memorandum; the will of 1893 was read, she stated her wish to make some ( “ a few ”) changes, the notary asked her to give him the idea then, and he took •down the memorandum of the dispositions she intended, then the notary commenced to write the will, requesting the witnesses to pay special attention; when the notary came to the part of the caption, “in the form and manner following,” i. e., immediately preceding “My name is Margaret Hennessey,” she proceeded to dictate to him word for word, as stated in the will, he assisting her in phrasing the will, •i. e., in using language proper in phrasing bequests, and the witness repeats she dictated the will word for word, by repeating the language suggested by the notary. In this method every disposition the will contains was dictated by the testatrix to the notary and written by him, as dictated. We have given attention to the discussion that the memorandum, whether on the will of 1893, or on a separate paper, was not produced, though called for on cross-examination of • the witnesses, and it is claimed there is no affirmative statement that the memorandum conformed to the will, o-r that the memorandum was read for verification, and that there was any memorandum at all is controverted in argument. In •the cross-examination of the. witnesses present when the will was made, there are statements to the general effect they saw no paper or have no recollection on the subject. But it occurs to us the witnesses, wich no functions but to be present and attend to the dictation, writing, reading the will and to sign the act, would not be apt ■to notice, or remember if they noticed, a memorandum or the will of 1893 on the table where the notary was writing. We have before us his testimony he did have before him such a memorandum, or the will of 1893. Standing unimpeaehed and with no interest in this controversy, we must accept his testimony on the point, supported as he is by the testimony of the executor, also present. Nor is it singular, in our view, that the notary should not be able to recollect whether or not the memorandum was on a separate paper -or that such paper, or the copy of the will of 1893 used by him, should not have been preserved with no appreciation, doubtless, on *1386 his part, that either would be ever needed. If the testimony of the notary and the executor is not to be disregarded, we must accept that the will conformed to the memorandum. It represented, as they testify, her wishes communicated before the will was written, read to her after, eliciting her assent as the expression of her desires. It seems to us the reading of the memorandum would have added no greater sanction to the will.
The argument for the plaintiffs assails the manner this will was dictated. It was the dictation, it is insisted, of the notary, not of the testatrix, or, as the argument puts it, it is the notary dictating and the testatrix dictating back. There has been a copious citation from the French authorities on this point, all to the effect that the dictation exacted by the law is the free, spontaneous utterance of the testator’s wishes, not the suggestions of others. With some differences in modes of expression, the commentators on the Art. 972 of the Napoleon Code, corresponding with Art. 1578 of our Code, all agree as to the sense of dictation. The requirement of the Code is in the simplest and most condensed language. The nuncupative will by public act must be received by the notary * * * dictated by the testator, and written by the notary as dictated.” Boilleux, perhaps, states the law with precision and fullness equal-to any other write: “Le testament doit étre dicté par le testateur, dieter dans le sens que donne á ce mot par de l’academie, e’est Iprononcer mot á mot ce qui doit étre écrit par un autre. La loi veut faire entendreique le testateur doit exprimer intelligiblement et de lui méme ses dernieres volontées, pour qu’elles soient éerivent par le notaire á mesure de leur prononciation. On ne peut done testa par signe. Ainsi le meut ne pourrait faire un testament par l’acte [public, le notaire ne pourrait valablement copier un projet éerits, bien plus, le testament serait nul si le testateur avait exprimé á volonté par monosylabes sur les interpellations du notaire. Toutes fois le notaire peut addresser quelque questions ou observations; il peut méme lui suggérer le mot propre á exprimer clairement sa pensée, maisil doitse garder de provoquer soit lirectement ou indirectement un acte de disposition.” 4 Boilleux, p. 99; Marcadé, Troplong, Coin De Lisle and the other authorities are to the same effect. The decision of the court in Landry vs. Tomatis, 32 An. 113, gives prominence to a similar passage from Coin De Lisle. The testator can not copy the projet of the will; nor can *1387 the testator express his wishes by signs; it must be the dictation of the voice; nor will the law be satisfied if the testator merely responds to the questions by the notary. But within these limits, it is the uniform current of authority that the notary, without inducing, directly or indirectly, any disposition, may suggest the words to properly express the testator’s wishes. In the very early case of Hamilton vs. Hamilton, 6 N. S., p. 146, the court held that a variation in the will from the exact words of the testator would not affect its validity. In Gonzalez vs. Gonzalez, 13 La. 106, a will dictated in one language, translated into another by the notary, and then read, was annulled, because of the absence of dictation in the language it was written; read in the language the testator did not understand, and because the hazards of transformation the words of the testator underwent. In the case of Succession of Marigny, 16 An., p. 267, and in the case of Prendergast vs. Prendergast, 16 An. 219, the reasoning of the court dealing with dictation must be understood with reference to the point at issue, whether dictation of the nuncu-pative will under private signature must be shown, when, under the article of the Code 1581, the will is presented to the witnesses with the declaration the paper contains the will of the testator. In Bordelon vs. Barron, 11 An. 679, the court, discussing the theory on which the law requires dictation, observed, the term implies the independent volition of the testator that the word “ nuncupative ” shows that the laws contemplated the announcement of the testator’s intentions from his own mouth; that the notary is the amanuensis, and if his is the controlling mind originating and preparing the disposition, the will is that of the amanuensis, not the testator. In Langley’s Heirs vs. Langley’s Executors, 12 La. 117, the decision turned on the absence of one of the witnesses at the dictation. In Starrs vs. Mason, the court treating, it is true, with but a slight difference between the testator’s words and those used by the notary, maintained the will, observing that it was the jdentlty of' thoughts not words the law required. In Godden vs. Executors of Burke, 35 An. 179, the case was that of a testator, weak in mind and body, conferring with his counsel in reference to making a will; the counsel prepared a memorandum of the desired dispositions as he understood them, and thereafter the testator, the notary and the witnesses repaired to a room and with no previous conference with the notary or witnesses, in the language of the opinion, the testator *1388 with the paper in his hand dictated, in the words given to him by one sitting at his side, every part of the will. The will sought to exclude the testator’s child, and the report of the case informs us was soon followed by the suicide cf the testator. Three of the judges concurred in annulling the will, and one at least was influenced solely on the ground there was no dictation. On the rehearing the will was sustained ; but the question of dictation seems to have been altogether excluded from consideration, the majority conceiving the question was not- at issue. It seems to us that decision can exert no material influence. In the case of Landry vs. Tomatis, 32 An. 113, the testatrix spoke English imperfectly, she perfectly understood the disposition she was to make, but availed herself of the assistance of her counsel. As the court puts it, it is no cause of nullity that a testator, not accustomed to the technical language of testamentary dispositions, has availed of assistance in selecting the words and shaping the phraseology he has immediately dictated to the testator. The decisions we have briefly reviewed, and others cited in support of plaintiff’s case, have had our careful consideration. While text writers and decisions concur in excluding from dictation by the testator bequests that others prompt him to make, and give him the words which he repeats to convey their desires, it seems to us the mere fact that an uneducated testator, without furnishing cause to annul the will, may well use the suitable phraseology furnished by the notary to express the dispositions which the testator himself has resolved upon and desires to have carried into effect. It is undoubtedly better in all cases the words of the testator should be transcribed as they fall from his lips. But the law grants the privilege of the last will in nuncupative form by public act to all, the learned as well as the uneducated. Without some assistance, the ignorant would be seriously embarrassed, if not utterly incapable of executing the will most convenient of all forms to those who can not write.
Our law utterly excludes as causes to annul wills, proof of hatred, anger, or other influences capable of operating on the mind of the testator in directing his testamentary dispositions. Civil Code, Art. 1492. It does require the free dictation of his wishes. We are impressed with the importance of close scrutiny to determine whether the will faithfully represents the testator’s wishes, in all eases where he has been aided by others in that expression. We have weighed with care all the testimony connected with the dicta *1389 tion in this case. In our view that dictation, in all substantial respects, announced the matured purpose of thetestatrix. It would be to strain reason and law, we think, to annul a will couched in legal form, fortified by the strongest testimony as the manifestation of the testatrix’ wishes, merely because the form of words she could not command, suggested by the- notary in the frame of language, expressing the desires of her heart.
It is therefore ordered, adjudged and decreed that the judgment of the lower court be affirmed with costs.