165 So. 307

**ROSTRUP v. SUCCESSION OF SPICER.**

No. 33204.

Jan. 6, 1936.

Arthur J. Finney, of Covington, for appellant.

Victor E. Plauche, of Covington, for appellee.

ODOM, Justice.

Mrs. Spicer died in St. Tammany parish on February 18, 1934, leaving certain property which she disposed of by last will dated January 9, 1934. The will is nuncupative in form by public act. Mrs. Spicer had no forced heirs. She left all her property to Mrs. Wilhelmina Chattellier Menant, upon whose petition the will was admitted to probate. Mrs. Emma Rostrup, a cousin of the deceased and her only known relative, filed opposition to the will, alleging that it was null because of certain defects in its confection and because Mrs. Spicer did not, at the time the will was made, have testamentary capacity. The trial judge found and held that the will was valid in form and that Mrs. Spicer was mentally capable of making a valid disposition of her property. The opponent, Mrs. Rostrup, appealed.

The first alleged defect in the confection of the will is that the notary did not state that he was "duly qualified." There is no merit in this objection. In the certificate of the notary, it is recited that he was duly commissioned and sworn as such, and that he was acting in and for the parish of St. Tammany. If he was "duly commissioned and sworn," he was "duly qualified" in law to act as a notary. Succession of Marqueze, 50 La.Ann. 66, 23 So. 106.

The next objection was that the notary did not state the age of the witnesses. That was not necessary. It was held in Succession of Paulino Del Escobal, 42 La. Ann. 1086, 8 So. 268, 9 L.R.A. 829, that "the nuncupative testament by public act need contain no other description of the witnesses than their names, their number, and their residence. It need not expressly negative the existence of incapacities, which are matters for exterior proof, as ground of nullity." Paragraph 1, syllabus.

The next objection is that the testatrix did not sign the will, but that her name was signed thereto by the notary. The document recites, and the testimony of the attesting witnesses shows, that the notary asked Mrs. Spicer if she could sign her name, and that she said she could not be-

cause her right hand and arm were partially paralyzed, and that the notary then wrote her name, and that she made her usual mark. This is permissible under the Code, and is the form usually followed in such cases, and has been sanctioned by this court. Brand v. Baumgarden, Executrix, 24 La. 628; Succession of Nelson, 163 La. 458, 112 So. 298; Succession of Gauthreaux, 173 La. 993, 139 So. 322, and authorities cited in the last case.

■ The next objection is that the will was not dictated to the notary by the testatrix in the presence and hearing of the witnesses, and that it was not written by the notary as dictated by her. There were five witnesses to the will, each of whom was called as a witness on the trial of this opposition. Without exception, these witnesses testified that there were present when the will was prepared nine persons, the testatrix, the notary who prepared the will, the five witnesses, Mrs. Menant, who was ·named universal legatee, and her husband; that they were all assembled in a room at the home of Mrs. Menant, that the testatrix, while seated in a rocking chair in the room, dictated the will to the notary in the presence and hearing of all these persons; that the will was written by the notary in their presence and in the presence of the testatrix as dictated by her, and that, after it was so dictated and written, the notary then read it aloud in their presence and hearing and in the presence and hearing of the testatrix; that, after reading the will, the notary asked the testatrix if she understood what was read to her and that she said she did; that she was then asked if the document read to her expressed her desires as to the disposition she wished to make of her property and she said that it did. They further testified that this was all done at one place and sitting without interruption and without turning aside to other acts. According to these witnesses, all the requirements of article 1578 of the Civil Code were complied with.

■ But it is argued that the will was not written by the notary "as dictated" by the testatrix. The point urged is that the will as written by the notary is not couched in the exact language used by the testatrix; that there are some words used in the will not used by the testatrix in dictating her desires and intentions to the notary. That seems to be conceded. Even so, the will is not void for that reason. Article 1578 of the Code says that nuncupative testaments by public act must be dictated by the testator and "written by the notary as it is dictated." But this does not mean that the notary must, in his draft of the will, use the exact words, the identical verbiage which fell from the lips of the testator in dictating the will. It is "identity of thoughts and not of words which the law requires." Hamilton v. Hamilton et al., 6 Mart. (N.S.) 143; Starrs v. Mason, Executor, 32 La.Ann. 8; Landry et al. v. Tomatis et al., 32 La.Ann. 113; Succession of Cauvien, 46 La.Ann. 1412, 16 So. 309; Hennessey's Heirs v. Woulfe, 49 La. Ann. 1376, 22 So. 394.

Each of the witnesses who attested the will was asked what Mrs. Spicer said to the notary when he asked her what she wanted put into her will. Their answers, with some slight variations, were that she told him she wanted her debts paid and that

she wanted the following disposition made of her property: That she wanted Mrs. Wilhelmina Chattellier Menant to have all of her property of every character and description if she continued to live with Mrs. Menant until the date of her death. A reading of the will shows that these desires and this bequest were faithfully and correctly recorded by the notary. In the will there are used such terms as "give and bequeath," "without bond and with full seizin." It is suggested that the testatrix, being an unlettered woman, could not have used such words or terms because the probabilities are that she did not understand their meaning. That is probably true. But the fact remains that the will as written by the notary faithfully and truly records the intent and desire of the testatrix in almost her exact language, according to the testimony of the five witnesses, all of whom, except one, are shown to be business men with fair education.

The next and last attack made on the will is that the testatrix did not at the time she made the will possess testamentary capacity; that she was 80 years old, feeble both in body and in mind; that she was incapable of understanding what was read to her and unable to attend to her own business; that her mind at the time was that of a child 3 or 4 years old; that she was suffering from senile dementia due to diseases.

■ The district judge correctly says in his written opinion:

"In the absence of forced heirs, the law permits a person to make such disposition of his property after death as his wish or fancy may choose, so long as such person has the proper testamentary capacity, which is defined to be the ability to comprehend the condition of one's property and his relation to those who might naturally expect to become the objects of his bounty. Did the testatrix in this case at the time of making the will in question possess that testamentary capacity? If she did, it is the duty of the courts to respect and enforce her wishes after her voice is stilled in death. The law presumes that a person who makes a will is possessed of that capacity and the burden rests upon those who attack the will to show that the testatrix at the time of making the will was not possessed of such testamentary capacity.

"It is patent that the greatest incapacities with which the testatrix in this case was afflicted at the time of making the will were those arising from and incident to old age."

■ The trial judge correctly summarized the testimony of opponent's witnesses as follows:

"Dr. F. F. Young says that the testatrix had the mind of a ten year old child. He says that she was not insane. He treated her off and on for several years up to a few weeks before her death and states that she was suffering from chronic bright's disease, known as cardiac renal changes, heart and kidney trouble, and marked arterio-sclerosis and excessive fat. He concludes that this condition coupled with her age lowered her mentality. She was at one time much devoted to Mrs. Bosquet, who attended her for some time, but suspected her of illicit relations with her husband, and acquired an intense jealousy and hatred for her. This condition does not necessarily

show insanity, but one of the obsessions peculiar to old age—and sometimes manifested in people much younger. He says that she was concerned about her business affairs after the death of her husband. This indicates that she had some idea of what she needed and her relations to her property.

"Dr. Cautreaux testified that the testatrix several months before her death when he visited her was suffering from many physical ailments which affected her mind and rendered her mentally incompetent. He says she was not insane from any cause except senile degeneration. He places her mental capacity six months before her death at about 25% of normal. This indicates that she was not entirely incompetent in the opinion of this witness.

"The other witnesses for the opponent testified mostly as to peculiar acts and statements of the deceased; some of these were manifestations of irritability; others those characteristic of an old person, childishness, imagined slights, little jealousies, periods of depression followed by periods of elation. These did not indicate insanity or dementia, but were the common manifestations of physical disability and extreme old age."

He then says:

"On the contrary, it is shown by the testimony of the five witnesses and the notary who were present when the will was made that the testatrix showed no signs of insanity or dementia, but seemed to understand fully what she was doing and the dispositions she was making of her property. If there had been any unusual evidence of defective mentality in this old lady at the time the will was drawn these witnesses and the notary certainly would have observed it, and from my knowledge of their integrity, I am sure they would have so testified in this case. The minister of the deceased visited her not many days from the execution of the will, and he testifies that she conversed with him in a very rational way, and gave him some money to apply on a burial lot on which she had promised some time before to make a payment. If there had been anything unusually abnormal about her mentality, this minister would have observed it, and no doubt would have testified to it in this case. The testatrix, only a few weeks before she died, and a few days before she made this will, gave the undertaker who buried her husband information regarding his birth, residence, and death sufficiently accurate to enable him to make out the death certificate. This indicates that she knew at that time what she was doing. To the same effect is the testimony of Dr. Roland Young."

We have carefully read all the testimony and concur in the conclusions reached by the trial judge that the testatrix knew and realized perfectly what she was doing when she made her will. The best answer to opponent's attack on the will is the testimony of the five witnesses who were present when the will was made, the physician who attended her just before and just after the date of the will, and the minister who visited her during her last illness. These all say that, although her mental faculties may have been somewhat weakened, she understood perfectly what she was doing and what was going on about her. We are convinced, as was the trial judge, that she had sufficient

mental capacity at the time to realize what she had and what she wanted to do with it. That is the true test.

In Succession of Mithoff, 168 La. 624, 122 So. 886, it was held that, if a testator possessed sufficient disposing capacity at the time the will was executed, it is valid "even though it be shown that she suffered complete dementia before and after the making of the two donations."

We have no doubt that Mrs. Spicer had undergone considerable mental decay due to her great age and physical infirmities. The vagaries of her mind which are relied on to establish her want of testamentary capacity were but natural under the circumstances. We have not the slightest doubt, however, that she was mentally competent to make a valid will.

See Wilcox v. City of Hammond, 163 La. 489, 112 So. 375.

The judgment appealed from is affirmed, with costs.