SARTAIN, Judge.
These consolidated actions are concerned with attempts to invalidate donations inter vivos and mortis causa made by Joseph Louis Ruhl, now deceased.
By an act of donation dated January 24, 1958, the decedent donated the entirety of his estate to the Society for the Propagation of the Faith, Archdiocese of New Orleans, (hereinafter referred to as the Society), said estate consisting of extensive landholdings in the Parishes of Orleans and St. Tammany. Ancilliary to the act of donation was an agreement between Mr. Ruhl and the Society by which the donor, in essence, retained the full control and management of his estate, to include the collection of all revenues. In later acts of donation, Mr. Ruhl purportedly conveyed less significant tracts of land to the Society as he acquired them.
On September 1, 1961, Mr. Ruhl executed the following olograph:
“New Orleans, Louisiana “September 1st, 1961
“I, Joseph Louis Ruhl, hereby make this, my last will and testament, revoking all other wills ever made by me.
“I give and bequest to the Society for the Propaganda of the Faith, Archdiocese of New Orleans, all of the property I die possessed, of both movable and immovable.
“I name, designate and appoint the Right Reverend Monsignor Herman P. Loh-mann as my testamentary Executor, with full seizan and without bond.
“Thanks be to God and may He have mercy on my poor soul.
Joseph Louis Ruhl”
The testator died on September 27, 1963, at the age of seventy-six, after having been struck by an automobile. The decedent, left no forced heirs and was living separate and apart from his wife, Mrs. Ellis Sophie von Grosschoppe Ruhl, by virtue of a judgment of separation from bed and board rendered by the 22nd Judicial District Court, Parish of St. Tammany.
On October 3, 1963, the executor of the will opened the Succession of Joseph Louis Ruhl and the testament was duly probated. Subsequent to this filing, Mrs. Ruhl entered suit against the Succession of her late husband claiming to be a widow in necessitous circumstances and seeking the one-fourth portion provided in Civil Code Article 2382. Mrs. Ruhl had been isolated from the assets acquired by Mr. Ruhl by virtue of a marriage contract entered into by the parties prior to their wedding. By way of settlement of her claim against the estate, the Society voluntarily transferred to her certain property within the Parish of Orleans.
On August 13, 1965, these companion suits were initiated by sisters of the deceased seeking to have the will declared null and void and the property transferred by it returned to the Succession on the *440 grounds that Mr. Ruhl was of unsound mind at the time of its confection and, alternatively, that he was unduly influenced by various acquaintances prior to its writing. Upon the death of Mrs. Lorena Ruhl Hillerich, one of the plaintiffs herein, her sons, Carl J. Hillerich and Louis J. Hillerich, were properly substituted for her.
Prior to the trial of this protracted litigation, the District Judge concluded that the pivotal issue for determination was the soundness of mind of the testator on the day of writing the will, and that the attacks upon the donations inter vivos would necessarily fall unless the testament was invalidated. Accordingly, the testimony was generally focused upon that question.
As expressed in his written reasons for judgment, the District Judge determined that the plaintiffs failed to establish that the testator lacked the soundness of mind necessary to write a valid will and that the evidence clearly preponderated to the contrary. We affirm that judgment.
The voluminous record compiled herein contains the testimony of some twenty or more persons from all walks of life whose familiarity with Mr. Ruhl ranged from extremely intimate to knowing him by reputation only. Consistent throughout the entirety of that lay testimony elicited, whether from a plaintiff or defense witness, is that Joseph Ruhl was a man of considerable intellect. The eccentricities of the man are related at length, but his intellectual capabilities do not seem to be questioned by those who knew him.
These witnesses portray an extraordinary man of considerable wealth whose unbending and fastidious habits were, unquestionably, unusual. We are able to surmise that his primary concern in life seem to be with his future in the hereafter, particularly in his later years. Upon retiring from the automobile business in 1939, Mr. Ruhl undertook to devote his time and his fortune to charitable interests. Apparently' content to reap the benefits of his Orleans and St. Tammany Parish properties, he began a self-styled program of aid for the refugees of the war-torn European countries, particularly Germany. His charitable endeavors initially consisted of the collection of large amounts of clothes and supplies which he would ship abroad; later, however, this work took him personally to those countries for months at a time where he became involved with direct distribution to the poor. His work was widely recognized by the hierarchy of the Roman Catholic Church, under whose auspices he worked.
As early as 1939, Mr. Ruhl expressed his desire to leave all that he died possessed of to the Society which is a world-wide Roman Catholic organization dedicated to aiding the poor and personally directed by the Roman Pontiff. The record indicates that he never wavered in that resolution.
There are suggestions in the record that his efforts on behalf of the poor were, at times perhaps misguided, as it was demonstrated that possibly some of the items collected for their benefit could be of little use. Such actions could, at most, be characterized as errors in judgment, which seem to be greatly overshadowed by the considerable good actually done by the decedent.
While engaged in one of these charitable ventures abroad, Mr. Ruhl met, in Bremen, Germany, Ellis Sophie von Grosschoppe, a German citizen whose courtship is well documented in the record. We are told by Mrs. Ruhl, and by a review of their premarital correspondence, of a rather idyllic initial relationship in which Mr. Ruhl seemingly wished to bestow upon her all that his wealth would allow, of a material nature. They were married on May 20, 1953 in Bremen and began their married life with much travel, gaiety, and in a style only experienced by the very wealthy.
Her future life at the St. Tammany Parish home was in bleak contrast. There, she was relegated to harsh circumstances exemplified by an unheated home, cooking on a wood stove, sleeping on an Army cot, *441 and the denial of an automobile which necessitated her, at times, walking considerable distances for groceries.
Without further belaboring the unfortunate details of this marriage, it will suffice to conclude, as previously noted, that Mrs. Ruhl eventually obtained a legal separation which was in effect at the time of the testator’s demise.
Counsel for plaintiffs has relied considerably upon the above-described circumstances surrounding this marriage and the alleged undesirable change in Mr. Ruhl’s attitude, it being strenuously urged that this marked difference is indicative of the onset of a mental derangement more fully explained in our discussion of the expert testimony here presented.
The testimony of those constantly in contact with Mr. Ruhl does not substantiate this premise. Business and professional associates testified that, up to the day of his death, he was a man of keen intellect, well informed on political affairs and current topics, and possessed of an astute business mind. Mr. Lawrence Goubler, a Vice President of Whitney Bank of New Orleans and Mr. Earl McGowan, the business manager of a New Orleans Chevrolet dealership, attested to the deceased’s business acumen and clarity of thought, even in the years following the making of the will.
Mr. McGowan, who had been with the testator on the day of his death, stated that “he always possessed a keen mind” and that he was “always the same”. This observation is typical of the impressions related by numerous others who knew him beyond the date of his will. Indeed, even his estranged wife corroborated his mental competency by observing that she never thought he did anything which was not intelligent.
The conclusion is inescapable that those who knew Joseph Ruhl, even witnesses offered by the plaintiff, believed that he possessed his mental faculties for as long as they knew him. To be sure, his eccentricities and peculiarities were recognized and known by those in contact with him, but his mental ability was never doubted.
The marked change Mr. Ruhl exhibited in his affection for his wife, together with his admittedly strange mannerisms and habits are factors which should be deferred to the medical experts rather than taken by us and used as grounds for depriving the testator of his right to dispose of his estate.
Four psychiatrists possessing excellent medical qualifications served as expert witnesses at the trial. None of these physicians had ever met or examined Mr. Ruhl. Drs. Lucio E. Gatto and Charles R. Smith, for the plaintiffs, prepared reports and opinions based upon reviews of the testator’s correspondence, as supplied them by counsel for the plaintiffs, and the court record of the Ruhls’ separation proceeding.
Dr. Gatto related that psychiatrists often make mental evaluations of deceased persons from similar material as that furnished him in these actions and that he had personally done it on many occasions. He concluded that Ruhl was mentally incompetent to make a will as he found that the deceased suffered from the mental disorder, paranoia.
Of the four physicians testifying, it seems that Dr. Gatto most completely defined this mental condition, as he stated:
“A In my opinion, true paranoia is a type of mental derangement in which an individual shows a definite distortion and delusional system of ideas, which pertain to one major area, in that person’s life. At the same time the distorted, dilusional (sic) type of behavior exists, the individual usually shows good in-tellegence, (sic) is well oriented in time and space and other spheres of his activity, except for the area of marked emotional conflict, he’s capable of carrying of an apparently recognizably normal existence and can handle, let’s say, most *442 of his everyday affairs, again, except in this particular one sphere. This type of individuals are also capable of giving very logical explanations for the type of behavior that is so grossly distorted that at times they appear to prove exactly what they are doing. In other words, there is no evidence of disorientation, no confusion, but when this one particular conflict is either attacked or it comes into active existence, it represents the delusional state of thinking, feeling and behaving.”
Dr. Kenneth A. Ritter, a psychiatrist offered by the defense, further elaborated on this condition in the following colloquy:
“A * * * It’s an extremely rare condition.
“Q What would you mean by ‘extremely rare condition’?
“A I would grant you that most psychiatrists, who practice for twenty years, might see a case or two. Ordinarily, these people function well, and you ordinarily do not see them come in, and even in surveys of the general population this point is unknown. It is an extremely rare condition.
“Q Doctor, would a true paranoia be a type of condition which would be rather difficult to diagnose?
“A Yes, sir, it is, as a matter of fact. The delusional system is so logical, and so systematized, without any association, and the behavior is so consistent and logical that one accepts the preliminary premise, which may annovate (sic) for years ahead. It is extremely difficult to diagnose.”
Dr. Gatto’s lengthy testimony thoroughly reviewed the processes by which he determined that paranoia existed. A considerable part of his findings were related in narrative form as the doctor based his remarks upon a previously prepared written report. His findings are best summarized by this commentary:
“ * * * The state of paranoia included the marked contrast between an apparent grandiose, omnipotent, over generous lord of the manor type of behavior in evidence both in Europe and as I said, for example in Arnaud’s, with his wife in Covington, where he forced himself to love (sic) as though proverty (sic) stricken and where he forced his wife to live in a dilapidated house, with no real source of heat, while he supplied, according to information, heat for his Persian cats in a bathroom at night. His refusal to live [in] a wholesome union with his wife in matrimony, preventing her from having the usual comforts, the usual comforts of a suitable bedroom, indicates again practically delusional attitudes and apparent primitvie (sic) actions, for whatever unknown cause. Other information indicates, despite evidence of wealth, his wife frequently wore cast off clothing that he allegedly collected to give to charity. Despite corresponding (sic) indicating a desire to provide his future wife with a happy life and a suitable home, despite his marriage, allegedly making his wife an equal partner, he appeared to have treated her as an indentured servant, denying her of her marital rights, while professing great love and sympathy in his work of salvation of the poor. This incongruous, parsimonious type of life' typically fits the paranoia of this person, who places in one compartment his apparently vindictive attitude toward his alleged loved ones and simultaneously, appears to live a grandiose life of regaling and bestowing great dinners on certain individuals, who, unconsciously and perhaps unwittingly, played into his need to be viewed as a savior of the poor.”
These findings were essentially concurred in by Dr. Smith.
Dr. Donald Carlos, along with Dr. Rit-ter, offered testimony on behalf of the defense. Both initially expressed skepticism of any psychiatric diagnosis made without an examination of the patient, to include physical and neurological evalúa- *443 tions in addition to any mental studies. They verified the rarity of the disease and related that great time and care would be required of a psychiatrist to reach a positive diagnosis of paranoia.
Dr. Carlos, then serving as President of the Staff of De Paul Hospital in New Orleans, positively stated that such a diagnosis would be pure conjecture without physical or neurological examinations to eliminate the possibility that the person suffered from a chronic brain syndrome, rather than paranoia.
Dr. Ritter, a physician of eminent qualifications, and, at that time, President of the Louisiana Psychiatric Association, viewed with considerable doubt attempts to arrive at any diagnosis lacking a clinical examination of the subject, and characterized any such conclusions as an “educated guess” unworthy of publication in any medical journal.
Our jurisprudence has restated on many occasions the presumption that a testator possesses the capacity to execute his will and that the burden of proving lack of testamentary capacity falls upon those attacking it. Succession of Holland, 236 La. 8, 106 So.2d 697 (1958); McCarty v. Trichel, 217 La. 444, 46 So.2d 621 (1950); Succession of Stafford, 191 La. 855, 186 So. 360 (1939); Rostrup v. Succession of Spicer, 183 La. 1087, 165 So. 307 (1936); Succession of Papa, 192 So.2d 854 (La.App.4th Cir. 1966).
Prior expressions of our Supreme Court have also dictated that the olograph itself be of considerable weight in determining the capacity of the writer and that where it is, on its face, sensible and judicious, its validity may be presumed. Succession of Franz, 232 La. 310, 94 So.2d 270 (1957) and authorities cited therein.
We are unable to find that the provisions of the document offered for probate here indicate any mental infirmity on the part of the writer.
We also find, as did the trial judge, that the medical evidence presented by plaintiffs is not, of itself, sufficient to compel us to conclude that Mr. Ruhl was of unsound mind when executing this document.
“Manifestly, we know of no rule of law which makes it imperative upon the courts to resolve the issue of testamentary capacity solely upon the testimony of medical experts. Of necessity, the testimony of medical experts should not be ignored but should be considered and weighed along with all of the facts and circumstances presented in the record. It is equally true that lay testimony must be taken in connection with expert testimony, attaching to it such weight as would guide us in resolving the issue of mental capacity.” Succession of Holland, supra.
As previously pointed out, the lay testimony is overwhelmingly in contradiction with a conclusion of mental incapacity. Counsel for plaintiffs strenuously argue, however, that the findings of their psychiatric experts as to Mr. Ruhl’s condition stand uncontradicted in the record, as the expert testimony offered by the defense does not specifically reach the question of Mr. Ruhl’s capacity, but, instead, deals only in generalities.
The testimony of Mrs. Carlos and Rit-ter, however, casts in serious doubt, any psychiatric evaluation whatsoever, that did not include a physical examination of the patient. They stated that they would not offer any opinion as to his mental condition without such personal contact. Under the facts of this case, and in view of the admitted rarity of the alleged paranoid condition, we adopt that conclusion. The presumption in favor of the validity of this will should not be overcome by conjecture.
Counsel for appellants has attacked the constitutionality of Civil Code Article 1492, which provides as follows:
“Proof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation.”
Assuming, arguendo, that the article is violative of due process guarantees under *444 either the Louisiana or United States Constitution, the record before us clearly indicates that no undue influence was exerted upon the testator. On the contrary, it appears that for some twenty years or more prior to his death, Joseph Ruhl knew exactly what disposition he wished to make of his estate and that he never changed his mind. There is no indication that he ever vacillated from this resolution or that pressures were brought to bear to prevent him from doing so. Due to the wide latitude allowed by the trial judge, the matter of undue influence was thoroughly explored. We find no indication of impropriety and are thus precluded from reaching the constitutional question.
For the reasons assigned, the judgment of the District Court is affirmed, all costs to be paid by the appellants.
Affirmed.