BOLIN, Judge.
Mrs. Theo Dixon Guzik, the daughter of Mrs. Vada Mae Dixon, instituted this action to have declared invalid an olographic will, alleging the testament had been made at a time when testatrix was mentally incompetent. The will named as sole legatee and executrix Mrs. Elizabeth Christine Dixon (now Mrs. Cruse), widow of a deceased son of the testatrix. The will was admitted to probate on the petition of Mrs. Cruse, who now defends this action. From judgment decreeing the invalidity of the will Mrs. Cruse prosecutes this appeal. We affirm the judgment of the lower court.
The property involved is farmland located in Mississippi and was inherited by testatrix from her father while still residing in that state, hence the Louisiana laws of forced heirship are inapplicable.
There is no dispute regarding the law governing the validity of an olographic will, such as the one before us. Two articles of the Louisiana Civil Code are germane to this issue:
Article 1470:
“All persons may dispose or receive by donation inter vivos or mortis causa, except such as the law expressly declares incapable.”
Article 1475:
“To make a donation either inter vivos or mortis causa, one must be of sound mind.”
It has been long established that testamentary capacity is presumed, and the burden is upon the party attacking the will to prove the contrary by clear, positive and convincing evidence, not unlike the criminal law rule requiring proof beyond a rea *324 sonable doubt. See Succession of Mithoff, 168 La. 624, 122 So. 886 (1929).
The sole issue, both in the court below and on appeal, is factual; that is, has opponent to the will established by satisfactory and convincing evidence that Mrs. Dixon was mentally incapable of con-fecting the will presented for probate?
Mrs. Dixon was born in 1888 and was married and lived in Mississippi until 1964. She had two children, Robert, who is deceased, and Mrs. Guzik, present opponent of the will. Her husband died in 1933 and after her children left home Mrs. Dixon lived alone in Natchez until 1964 when she moved to a trailer parked behind her son’s home in Monroe. She lived there for two years, taking care of her own cooking and housework, although her son and daughter-in-law attended to any other needs she might have.
Dr. McAmis, a general practitioner in Natchez, treated Mrs. Dixon on a more or less regular basis from March 19S0 until she left that city in 1964. This doctor testified he had treated decedent for various conditions including osteoarthritis, anemia and later for depression and anxiety; that during 1953 he noted she seemed mentally unclear, indicating senile changes. He stated she felt she was “going downhill” and was quite concerned about her overall condition. In 1963 he made a notation that she was quite upset and he began treating her with medication to relieve her anxiety and depression, and he continued to treat her until she removed to Monroe in mid-1964. She was still able physically to care for herself at that time.
The testimony of neighbors and relatives who visited Mrs. Dixon while she was residing in the trailer was that decedent was physically active, generally alert and pleasant up until the sudden death of her son, Robert, in September 1966. Subsequent to this event her condition worsened rapidly and, according to her niece, Mrs. Edith Brown, she appeared to be in a state of shock, unable to make any rational decision and had to be watched after constantly.
On October 6, 1966 Dr. G. W. Wright, Jr., local physician who had treated Mrs. Dixon, completed a preliminary form necessary for her admission to a nursing home. In the space designated for “diagnosis” he wrote “senility”, and in answer to the question “mental illness” he wrote “as above”.
On October 24, 1966, Mrs. Elizabeth Cruse took the testatrix, her mother-in-law, before a notary public for the purpose of having her execute a power of attorney so that she (Mrs. Cruse) might be empowered to handle whatever financial transactions necessary to obtain funds for the care of Mrs. Dixon in the nursing home. Two days later, October 26, testatrix copied an olographic will furnished her by her daughter-in-law, substituting the date and names in proper places. In this will, which was wholly written, dated and signed by her, she left all of her property to “my daughter-in-law Elizabeth Christine Dixon”. A few days after the execution of the will Mrs. Dixon was placed in the nursing home where she remained until her death in August 1969.
The testimony was conflicting with regard to the testatrix’s mental and emotional state in the month following her son’s death and during the first months in the nursing home. Attendants and nurses testified that from the inception of her stay, Mrs. Dixon was generally pleasant and cooperative, but needed assistance and guidance in most physical functions and seemed disoriented and disinterested in normal activities. She was responsive to suggestion and persuasion in an almost child-like manner. This testimony was corroborated by her niece, Mrs. Brown. Although the record is replete with testimony about the steady progress of Mrs. Dixon’s arteriosclerosis and deteriorating mental and physical condition after she became a patient or resident of the nursing home, we think this testimony relevant only to the unremitting nature of her condition. In 1969 she was *325 interdicted, the attending physician noting she was “100% mentally incompetent."
The trial judge gave excellent written reasons for his decision in which he stated the law and carefully outlined the testimony of the witnesses upon which he predicated his opinion. He. commented that he was mindful of the heavy burden of proof required by the courts in order to justify nullification of a testament on the ground of mental incompetence. He observed the law does not require, however, that the testatrix he found completely “mad” or depraved or notoriously insane. Rather, the question is whether the testatrix “knew” what she was doing, what she had and what she wanted to do with it. Rostrup v. Succession of Spier, 183 La. 1087, 165 So. 307 (1936). Stated differently, did she have the mental and emotional capacity to deliberate her actions knowledgeably and act independently to make an unconfused decision ?
The trial judge resolved this question in the negative taking into consideration her physical and mental condition and the actions of the testatrix before and after, as well as at the time of making the will, which have been held of probative value in determining testamentary capacity. Succession of Herson (La.App. 1st Cir. 1961) 127 So.2d 61.
In conclusion he stated that, considered as a whole, the evidence is “clear and convincing that when she copied the will she lacked the mental and emotional capacity intelligently and deliberately to make decisions, with the influences of the moment, upon the serious business of disposing of all her property, or to appreciate the effects of what she was doing”, citing Artigue v. Artigue, 210 La. 208, 26 So.2d 699 (1946).
Our review of the record, with due regard to the testimony of all witnesses and to the medical evidence, convinces us of the correctness of the lower court’s finding that the testament was invalid. Accordingly, the judgment is affirmed at appellant’s cost.